Receipt number 9998-4854601

## UNITED STATES COURT OF FEDERAL CLAIMS

PERRY CAPITAL LLC, for and on behalf of investment funds for which it acts as investment manager,

        Plaintiff,

  v.

THE UNITED STATES OF AMERICA,

        Defendant,

FEDERAL NATIONAL MORTGAGE ASSOCIATION, FEDERAL HOME LOAN MORTGAGE CORPORATION,

        Nominal Defendants.

Case No. **18-1226**

## COMPLAINT

Perry Capital LLC, for and on behalf of investment funds for which it acts as investment manager (collectively, "Perry Capital" or "Plaintiff") by and through the undersigned attorneys, brings this action under the Fifth Amendment to the United States Constitution and 28 U.S.C. § 1491, seeking compensation for the taking or, alternatively, the illegal exaction of Plaintiff's property and the property of the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie") (collectively, the "Companies") and damages for breach of fiduciary duty and implied-in-fact contracts with the government. In support of its complaint, Plaintiff alleges as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      In August 2012, at a time when the housing market was recovering from the financial crisis and Fannie and Freddie had returned to stable profitability in a growing economy,

-1-

the federal government took for itself the entire value of the rights held by Plaintiff and Fannie's and Freddie's other private shareholders by forcing these publicly-traded, shareholder-owned Companies to turn over their **entire** net worth, less a small capital reserve, to the federal government on a quarterly basis **forever**—an action the government called the "Net Worth Sweep" and that effectively nationalizes the Companies.  This action is brought by Plaintiff, a holder of non-cumulative preferred stock ("Preferred Stock") and common stock ("Common Stock") issued by Fannie and Freddie seeking just compensation for the taking of their property and the property of Fannie and Freddie by the United States of America, acting by and through, *inter alia*, the Department of the Treasury ("Treasury"), the Federal Housing Finance Administration ("FHFA"), and agents acting at their direction.  Plaintiff alternatively seeks damages for itself and the Companies for an illegal exaction in violation of the Fifth Amendment.  And Plaintiff finally seeks damages for itself and the Companies for the government's breach of fiduciary duty.

2.      At Treasury's urging, in July 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA").  HERA created the Federal Housing Finance Agency (Treasury and FHFA are sometimes collectively referred to herein as the "Agencies") to replace Fannie's and Freddie's prior regulator and authorized FHFA to appoint itself as conservator or receiver of the Companies in certain statutorily specified circumstances.  HERA charges FHFA as conservator to rehabilitate Fannie and Freddie by taking action to put the Companies in a sound and solvent condition while preserving and conserving their assets.

3.      HERA also granted Treasury temporary authority to invest in the Companies' stock until December 31, 2009.  Congress made clear that in exercising this authority Treasury

was required to consider the "need to maintain [Fannie's and Freddie's] status as . . . private, shareholder-owned compan[ies]."

4.     On September 6, 2008—despite prior public statements assuring investors that the Companies were in sound financial shape—FHFA, at Treasury's urging, abruptly placed Fannie and Freddie into conservatorship.  Immediately after the Companies were placed into conservatorship, Treasury exercised its temporary authority under HERA to enter into agreements with FHFA to purchase securities of Fannie and Freddie ("Preferred Stock Purchase Agreements," "Purchase Agreements," or "PSPAs").  Under these PSPAs, Treasury designed an entirely new class of securities in the Companies, known as Senior Preferred Stock ("Government Stock"), which came with very favorable terms for Treasury.  At the outset, Treasury received $1 billion of Government Stock (via one million shares) in each Company and warrants to acquire 79.9% of the Common Stock of the Companies at a nominal price in return for its commitment to acquire Government Stock in the future.

5.     The Government Stock entitled Treasury to collect dividends at an annualized rate of 10% if paid in cash or 12% if paid in kind—an extraordinarily generous return in an economic environment in which interest rates on government debt were near zero.  The Government Stock was entitled to receive cash dividends from each Company only to the extent declared by the Board of Directors "in its sole discretion, from funds legally available therefor."  If the Companies did not wish to—or legally could not—pay a cash dividend, the unpaid dividends on the Government Stock could be capitalized (or paid "in kind") by increasing the liquidation preference of the outstanding Government Stock.  Therefore, the Companies were *never* required to pay cash dividends on Government Stock.  There was *never* any threat that the Companies would become insolvent by virtue of making cash dividend payments.  The PSPAs specifically

allowed the Companies to utilize this mechanism throughout the life of the agreements, thereby foreclosing any possibility that they would exhaust Treasury's funding commitment because of a need to make a dividend payment to Treasury.

6.      The Government Stock diluted, but did not eliminate, the economic interests of the Companies' private shareholders.  The warrants to purchase 79.9% of the Companies' Common Stock gave Treasury "upside" via economic participation in the Companies' profitability, but this upside would be *shared* with preferred shareholders (who had to be paid before any payment could be made on common stock purchased with Treasury's warrants) and private common shareholders (who retained rights to 20.1% of the Companies' residual value). James Lockhart, the Director of FHFA, accordingly assured Congress shortly after imposition of the conservatorship that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest.

7.      Under FHFA's supervision, the Companies were forced to excessively write down the value of their assets, primarily due to erroneous and unjustifiable accounting decisions. By June 2012, the Agencies had forced Fannie and Freddie to issue $161 billion in Government Stock to make up for the balance-sheet deficits caused by the Agencies' unrealistic and overly pessimistic accounting decisions, even though there was no indication that the Companies' actual cash expenses could not be met by their cash receipts.  The Companies were further forced to issue an additional $26 billion of Government Stock so that Fannie and Freddie would be able to pay *cash* dividends to Treasury even though, as explained above, the Companies were never required to pay cash dividends.  Finally, because (i) the Companies were forced to issue Government Stock to Treasury in return for funds that they did not need to continue operations

and (ii) the structure of Treasury's financial support did not permit the Companies to repay and redeem the Government Stock outstanding, the amount of the dividends owed on the Government Stock was artificially—and permanently—inflated.

8.      As a result of these transactions, Treasury amassed a total of $189 billion in Government Stock—a substantial sum, albeit far less than the $5 trillion in assets held in the Companies' mortgage portfolios.  But based on the Companies' performance in the second quarter of 2012, it was apparent that there was still value in the Companies' private shares.  By that time, the Companies were thriving and could easily pay 10% annualized cash dividends on the Government Stock without drawing additional capital from Treasury.  And based on the improving housing market and the high quality of the newer loans backed by the Companies, it was apparent that they had returned to stable profitability.  Indeed, the Agencies had specific information from the Companies demonstrating that this return to profitability was inevitable because the Companies would soon be reversing many of the non-cash accounting losses they had incurred under FHFA's supervision.  In light of that information and the broad-based recovery in the housing industry that had occurred by the middle of 2012, the Agencies fully understood that the Companies were on the precipice of generating huge profits, far in excess of the dividends owed on the Government Stock.

9.      The government was not content to benefit from its investment like an investor in any other company who would be bound by the terms of the original investment agreement.  The government did not want to share the value of the Companies with private shareholders.  It was committed to ensuring that, unlike all other companies that received financial assistance from the federal government during the financial crisis, Fannie and Freddie would be operated for the exclusive benefit of the federal government.  Indeed, unbeknownst to the public, Treasury had

secretly resolved "to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future"—and would later use those expropriated earnings to fund governmental operations.  Treasury also was seeking to transform the housing finance market by eliminating Fannie and Freddie, and it and FHFA had no intention of allowing the Companies to rehabilitate and exit conservatorship.  By the middle of 2012, however, it was apparent that even the large amount of Government Stock outstanding would not achieve these surreptitious policy goals.

10.      Therefore, on August 17, 2012, just days after the Companies announced record-breaking quarterly earnings, the Agencies unilaterally imposed the Net Worth Sweep to expropriate for the federal government the value of Fannie and Freddie shares held by private investors and to ensure that the Companies could not begin rebuilding their capital levels. Treasury itself said that the Net Worth Sweep was intended to ensure both that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers" and that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  With the stroke of a pen, the Agencies had nationalized the Companies and taken all the value of the Companies for Treasury, thereby depriving the private shareholders of all their economic rights.  No equivalent wipeout of private shareholder investments was imposed on other financial institutions that received assistance during the 2008 financial crisis, much less four years *after* that crisis was over.

11.      The Companies received no incremental investment by Treasury or other meaningful consideration in return for the Net Worth Sweep, which restricts them to a small maximum capital level above which any profits they generate must be paid over to Treasury. This was done notwithstanding "the path laid out under HERA," which, as even Treasury

acknowledged internally, was for FHFA to *rehabilitate* Fannie and Freddie, thus allowing them to "becom[e] adequately capitalized" and "exit conservatorship as private companies."

12.     Despite the transparent fact that the Net Worth Sweep was designed to expropriate private property rights, the government has claimed both in public and in prior filings in this case that the Net Worth Sweep was necessary to prevent the Companies from falling into a "death spiral" or "downward spiral" in which the Companies' increasing dividend obligations to Treasury would consume Treasury's remaining funding commitment to the Companies.  This made-for-litigation defense narrative is wholly inaccurate.[1]

13.     As an initial matter, the government did not impose the Net Worth Sweep at a time when the Companies were struggling to generate enough income to pay the dividend on Treasury's stock.  Rather, the Net Worth Sweep was imposed just days after the Companies disclosed that they had returned to stable profitability and had earned several billion dollars more than was necessary to pay the Treasury dividend in cash.  And it was by then virtually inevitable, thanks to a strengthening housing market and the improving quality of loans guaranteed by the Companies, that they would soon reverse the non-cash accounting adjustments that were responsible for the great majority of the losses that they had experienced in the preceding years, thereby generating massive profits.  More importantly, quite apart from the Companies' improved financial outlook, the Companies were contractually protected from a scenario in which their dividend obligation to Treasury could cause a death spiral:  the Companies were

---

[1]  Indeed, even FHFA stepped back from this line of argument:  In FHFA's district court briefing in *Perry Capital v. Lew*, FHFA's principal justification for the Net Worth Sweep was that the Companies "were unable to meet their 10% dividend obligations without drawing more from Treasury, causing a downward spiral of repaying preexisting obligations to Treasury through additional draws from Treasury."  But in its December 2015 appellate briefing, FHFA argued that whether the Net Worth Sweep actually was designed to avert a death spiral was "irrelevant."

entitled under the PSPAs to pay dividends to Treasury "in kind," with additional senior preferred stock, rather than in cash.

14.     Materials produced in discovery in *Fairholme Funds, Inc. v. United States*, No. 13-cv-465 (Fed. Cl.), and later made public further undermine the government's death spiral narrative.  Indeed, those materials reveal that the Net Worth Sweep was adopted not out of a concern that the Companies would earn too little, but rather out of concern that the Companies would make *too much* and thus would complicate the Administration's plans to keep Fannie and Freddie in perpetual conservatorship and to prevent their private shareholders from seeing any return on their investments.  As a senior White House official stated in an email to a senior Treasury official on the day the Net Worth Sweep was announced, "we've closed off [the] possibility that [Fannie and Freddie] ever[ ] go (pretend) private again."  That same official stated in another email that Peter Wallison of the American Enterprise Institute was "exactly right on substance and intent" when he said that "[t]he most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What the Treasury Department seems to be doing here . . . is to deprive them of all their capital so that doesn't happen."  An internal Treasury document dated August 16, 2012, expressed the same sentiment:  "By taking all of their profits going forward, we are making clear that [Fannie and Freddie] will not ever be allowed to return to profitable entities . . . ."  These actions were totally contrary to the proper functioning of a conservatorship.[2]

---

[2]  *See Collins v. Mnuchin*, --- F.3d ----, 2018 WL 3430826, at * 33 (5th Cir. July 16, 2018) (Willett, J., dissenting in part) ("As conservator, the FHFA must "preserve and conserve" the GSEs' assets. In fact, the powers and functions unique to the FHFA as receiver—winding up and liquidating a GSE—are *antithetical* to the duties of

15.     The Net Worth Sweep has resulted in a massive financial windfall for the federal government at the expense of the Companies and their private shareholders.  Since the inception of the Net Worth Sweep, Fannie and Freddie collectively have been forced to pay to Treasury $124 billion more than the government would have received under the original PSPAs—funds that could instead have been used prudently to build capital reserves and prepare to exit conservatorship.  Adding Net Worth Sweep dividends to the dividends Fannie and Freddie had already paid, Treasury has now recouped $87 billion *more* than it has invested in the Companies.  Yet, according to the government, these payments have not reduced Treasury's liquidation preference by one cent, and Treasury continues to insist that it has the right to Fannie's and Freddie's future earnings *in perpetuity*.

16.     The Net Worth Sweep has resulted in a massive and unprecedented expropriation of private property.  To the extent this ongoing expropriation is authorized by law, the Fifth Amendment compels the government to pay just compensation to Plaintiff and the Companies for the taking.  To the extent it is not authorized, the Fifth Amendment compels the government to pay damages to Plaintiff and the Companies for the illegal exaction.  Indeed, in addition to exceeding FHFA's powers under statute, FHFA itself is an unlawfully organized agency because the Constitution's separation of powers does not permit an independent agency with far-reaching powers such as FHFA to be headed by a single Director rather than a multi-member Board.  HERA's concentration of power in one person who is only removable by the President for cause is unconstitutional.  The extraordinary control exercised by FHFA as conservator over Fannie and Freddie also created a fiduciary relationship between FHFA, on the one hand, and the

---

the FHFA as conservator—rehabilitating a GSE and operating it as a going concern, preserving its assets."); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 645 (D.C. Cir. 2017) (Brown, J., dissenting) (describing the Net Worth Sweep as "plainly antithetical to a conservator's charge to 'preserve and conserve' the Companies' assets").

Companies and their shareholders, on the other.  The Net Worth Sweep violated FHFA's

fiduciary duties.  The Net Worth Sweep also breached implied-in-fact contracts the government

and the Companies entered into when the Companies were placed into conservatorship.

Accordingly, Plaintiff and the Companies are entitled to just compensation and damages.

17.     Accordingly, through this action, Plaintiff seek the recompense to which they and

the Companies are entitled.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action and venue is proper in this Court,

pursuant to 28 U.S.C. § 1491(a)(1).

## THE PARTIES

19.     Plaintiff Perry Capital LLC is an affiliate of Perry Corp., which is an investment

advisor registered with the Securities and Exchange Commission under the Investment Advisor

Act of 1940.  Perry Capital primarily manages pooled investment vehicles, the Perry Funds, for

the benefit of pension funds, university endowments, foundations, and other institutional and

private investors.  Perry Capital is a limited liability corporation duly organized and existing

under the laws of Delaware, and its principal place of business is 375 Park Avenue, New York,

New York 10152.  The Perry Funds own Preferred Stock and Common Stock in each of Fannie

and Freddie.  (For ease of reference, Perry Capital LLC and the Perry Funds are referred to

collectively as "Perry Capital" or "Plaintiff.")  Perry Capital is entitled to a contractually

specified, non-cumulative dividend from the Companies in preference to dividends on Common

Stock.  Ownership of the Preferred Stock also entitles Perry Capital to a contractually specified

liquidation preference.  The Preferred Stock and Common Stock are junior to Treasury's

Government Stock.  If valid, the Net Worth Sweep expropriates the value of Perry Capital's Preferred Stock and Common Stock.

20.     Defendant United States of America includes Treasury, FHFA, and agents acting at their direction.

21.     Nominal party Fannie is a federally chartered, privately owned corporation with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016.  Under its bylaws, Fannie's corporate governance practices and procedures are governed by the Delaware General Corporation Law.

22.     Nominal party Freddie is a federally chartered, privately owned corporation with its principal executive offices located at 8200 Jones Branch Drive, McLean, VA 22102.  Under its bylaws, Freddie's corporate governance practices and procedures are governed by the Virginia Stock Corporation Act.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

23.     Plaintiff's claims are founded on the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation," and on HERA, 12 U.S.C. §§ 1455(*l*), 1719(g), 4617.

## FACTUAL ALLEGATIONS

### A.     Fannie and Freddie

24.     Fannie is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act.  Freddie is a for-profit, stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act.  The Companies' business includes purchasing and guaranteeing mortgages originated by private banks and

bundling the mortgages into mortgage-related securities that can be sold to investors. Prior to 2008, the Companies' mortgage portfolios had a combined value of $5 trillion.

25.     Fannie and Freddie are owned by private shareholders and their securities are publicly traded. Fannie was chartered by Congress in 1938 and originally operated as an agency of the federal government. In 1968, Congress reorganized Fannie into a for-profit corporation owned by private shareholders. Freddie was established by Congress in 1970 as a wholly-owned subsidiary of the Federal Home Loan Bank System. In 1989, Congress reorganized Freddie into a for-profit corporation owned by private shareholders.

26.     Before being placed into conservatorship, both Fannie and Freddie had issued Common Stock and several series of Preferred Stock that were marketed and sold to community banks, insurance companies, and countless other institutional and individual investors. The several series of Preferred Stock of the Companies are in parity with each other with respect to their claims on income (i.e., dividend payments) and claims on assets (i.e., liquidation preference or redemption price), but they have priority over the Companies' Common Stock for these purposes. The holders of Common Stock are entitled to the residual economic value of the firms. The Companies have outstanding Preferred Stock with an aggregate liquidation preference of $33 billion.

27.     Perry Capital's holdings include multiple series of Preferred Stock issued by the Companies, and Perry Capital has owned Preferred Stock since before August 17, 2012, and continuing through the present. In particular, Perry Capital's holdings of Preferred Stock include and have included:

**Perry Capital Holdings of Fannie
Preferred Stock**

| Series | Dividend Rate | Redemption Dividend Value per Series Rate Share |
|---|---|---|
| S | 7.750% | $25.00 |
| R | 7.625% | $25.00 |
| Q | 6.750% | $25.00 |
| P | 4.500% | $25.00 |
| O | 7.000% | $50.00 |
| I | 5.375% | $50.00 |
| M | 4.750% | $50.00 |
| H | 5.810% | $50.00 |
| L | 5.125% | $50.00 |
| G | Variable | $50.00 |
| F | Variable | $50.00 |
| 2004-1 | 5.375% | $100,000.00 |

**Perry Capital Holdings of Freddie
Preferred Stock**

| Series | Dividend Rate | Redemption Dividend Value per Series Rate Share |
|---|---|---|
| Z | 7.875% | $25.00 |
| Y | 6.550% | $25.00 |
| H | 5.100% | $50.00 |
| B | Variable | $50.00 |
| G | Variable | $50.00 |
| K | 5.790% | $50.00 |
| L | Variable | $50.00 |
| M | Variable | $50.00 |
| N | Variable | $50.00 |
| O | 5.810% | $50.00 |
| P | 6.000% | $50.00 |
| S | Variable | $50.00 |
| T | 6.420% | $50.00 |
| F | 5.000% | $50.00 |
| X | 6.020% | $25.00 |
| V | 5.570% | $25.00 |
| W | 5.660% | $25.00 |
| U | 5.900% | $25.00 |
| R | 5.700% | $50.00 |

28.     Under the Certificates of Designation setting out the terms and conditions of the Preferred Stock issued by Fannie and Freddie prior to September 6, 2008, each series of Preferred Stock issued by the Companies enjoyed parity with all other issued and outstanding series of Preferred Stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of the companies.  Thus, the holders of each series of Preferred Stock had equal contractual rights to receive their respective liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of the Companies.

29.     Like holders of Preferred Stock, holders of Common Stock also have property rights associated with their shares of stock. Fannie's and Freddie's charters both contemplate that the Companies will have common stock. *See* 12 U.S.C. §§ 1453, 1718(a). Under general corporate law principles, a corporation's common shareholders have, collectively, a right to the corporation's residual value through a right to participate in the corporation's residual earnings and a right, upon dissolution, to share in any residual proceeds from the assets. Common shareholders also have the right to participate in the corporation's management by voting on the selection of directors and on other matters. Indeed, "[t]he right . . . to attend and vote at meetings for the election of directors and on other matters submitted, . . . to participate in dividends and profits and in the net assets of the corporation on dissolution, are the most material rights incident to stock ownership." *Salt Dome Oil Corp. v. Schenck*, 41 A.2d 583, 588 (Del. 1945).

30.     Prior to 2007, Fannie and Freddie were consistently profitable.  In fact, Fannie had not reported a full-year loss since 1985 and Freddie had not reported a full-year loss since becoming owned by private shareholders.  In addition, both Companies regularly declared and

paid dividends on each series of their respective Preferred Stock and their respective Common Stock.

**B.      Fannie and Freddie Are Placed into Conservatorship**

31.     The Companies were well-positioned to weather the decline in home prices and financial turmoil of 2007 and 2008.  While banks and other financial institutions involved in the mortgage markets had heavily invested in increasingly risky mortgages in the years leading up to the financial crisis, Fannie and Freddie had taken a more conservative approach that meant that the mortgages that they insured (primarily 30-year fixed-rate conforming mortgages) were far safer than those insured by the nation's largest banks.  And although both Companies recorded losses in 2007 and the first two quarters of 2008—losses that largely reflected a temporary decline in the market value of their holdings caused by declining home prices—both Companies continued to generate enough cash to easily pay their debts and retained billions of dollars of capital that could be used to cover any future losses.

32.     Neither Company was in danger of insolvency in 2008.  Indeed, during the summer of 2008, both Treasury Secretary Henry Paulson and Office of Federal Housing and Enterprise Oversight ("OFHEO") Director James Lockhart publicly stated that Fannie and Freddie were financially healthy.  For example, on July 8, 2008, Director Lockhart told CNBC that "both of these companies are adequately capitalized, which is our highest criteria."  Two days later, on July 10, Secretary Paulson testified to the House Committee on Financial Services that Fannie's and Freddie's "regulator has made clear that they are adequately capitalized."  On July 13, Director Lockhart issued a statement emphasizing that "the Enterprises' $95 billion in total capital, their substantial cash and liquidity portfolios, and their experienced management serve as strong supports for the Enterprises' continued operations."  In August 2008, the Companies issued their financial statements, which reflected that as of the end of June 2008,

Fannie Mae's assets exceeded its debts by over $41 billion and that Freddie Mac's assets exceeded its debts by nearly $13 billion.  An analysis of Freddie's financial condition in August 2008 for FHFA by BlackRock stated that Freddie's "long-term solvency does not appear endangered—we do not expect Freddie Mac to breach critical capital levels even in stress case." Furthermore, on August 22, 2008, FHFA confirmed that Fannie Mae and Freddie Mac were adequately capitalized, even under additional capital requirements imposed by FHFA under its risk-based capital stress test.  *See* Letter from Christopher H. Dickerson, Acting Deputy Dir., FHFA, to Daniel H. Mudd, President and Chief Exec. Officer, Fannie Mae (Aug. 22, 2008); Letter from Christopher H. Dickerson, Acting Deputy Dir., FHFA, to Richard F. Syron, Chairman and Chief Exec. Officer, Freddie Mac (Aug. 22, 2008).  In sum, despite arguments to the contrary by lawyers for the Agencies in litigation related to the Net Worth Sweep, the Companies were not on the precipice of failure in 2008.

33.     Despite (or perhaps because of) the Companies' comparatively strong financial position amidst the crisis, Treasury initiated a long-term policy of seeking to seize control of Fannie and Freddie and operate them for the exclusive benefit of the federal government.  To that end, as early as March 2008, Treasury was internally discussing "potential costs and benefits of nationalization" of the Companies.  Around the same time, a Treasury official was the off-the-record source for a Barron's article that inaccurately claimed that the Companies' books overstated assets and understated liabilities.

34.     The Companies' sound financial condition in the weeks leading up to imposition of the conservatorships is further illustrated by the decision by Fannie's Board of Directors to declare dividends on both its preferred and common stock in August 2008 and by FHFA's subsequent decision as conservator to direct Fannie to pay those dividends out of cash available

for distribution in late September 2008.  It is a fundamental principle of corporate law that a company may not declare dividends when it is insolvent, and dividends that a company improperly declares when insolvent may not be lawfully paid.  Fannie's Board thus could not have lawfully declared dividends in August 2008 unless the Company was solvent at that time, and the Board's decision to declare those dividends showed its confidence that Fannie was financially healthy.  Furthermore, it is evident that both FHFA and Treasury agreed that Fannie was solvent when it declared dividends in August 2008 because, rather than halting or voiding the dividends that the outgoing Fannie Board had declared, both Agencies publicly took the position that Fannie was legally obligated to pay them even *after* conservatorship was imposed in early September 2008.

35.     Also during the summer of 2008, Treasury pressed Congress to pass what became HERA.  HERA created FHFA (which succeeded to the regulatory authority over Fannie and Freddie previously held by OFHEO) and authorized FHFA, under certain statutorily prescribed and circumscribed conditions, to place the Companies into either conservatorship or receivership.  Unlike its predecessor,  FHFA is an "independent" agency, 12 U.S.C. § 4511(a), and it is headed by a single Director who is only removable "for cause by the President," *id.* § 4512(b)(2).

36.     In authorizing FHFA to act as conservator under specified circumstances, Congress took FHFA's conservatorship mission verbatim from the Federal Deposit Insurance Corporation's governing statute, the Federal Deposit Insurance Act ("FDIA"), *see* 12 U.S.C. § 1821(d)(2)(D), which itself incorporated a long legal history of financial supervision and rehabilitation of troubled entities under common law.  HERA and the FDIA, as well as the common law concept on which both statutes draw, treat conservatorship as a process designed to

stabilize a troubled institution with the objective of returning it to normal business operations. Like any conservator, when FHFA acts as a conservator under HERA it has a fiduciary duty to safeguard the interests of the Companies and their shareholders.

37.     According to HERA, FHFA "may, as conservator, take such action as may be— (i) necessary to put the regulated entity in a sound and solvent condition, and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."  12 U.S.C. § 4617(b)(2)(D).  FHFA has acknowledged that "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition," and "[t]o fulfill the statutory mandate of conservator, FHFA must follow governance and risk management practices associated with private-sector disciplines."  FHFA, REPORT TO CONGRESS:  2009 at i, 99 (May 25, 2010). These statutory obligations are consistent with the responsibilities of conservators at common law.  *Conservator*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining conservator as "the modern equivalent of the common-law *guardian*" and a "managing conservator" as a "person appointed by a court to manage the estate or affairs of someone who is legally incapable of doing so" (emphasis added)).

38.     FHFA has repeatedly stated publicly that HERA *requires* and *mandates* FHFA as conservator to preserve and conserve Fannie's and Freddie's assets and to restore them to a sound and solvent condition.  The following are just a few examples:

- The provisions of 12 U.S.C. § 4617(b)(2)(D) are "statutory mandates" and as conservator FHFA "must follow the mandates assigned to it by statute." FHFA, STRATEGIC PLAN:  FISCAL YEARS 2018-2022 at 3–4 (Jan. 29, 2018), https://goo.gl/yDZmir.

- FHFA has "statutory obligations to operate the [Companies] in a safe and sound manner."  Prepared Remarks of Melvin L. Watt, Dir., FHFA, at American Mortgage Conference (May 18, 2017), https://goo.gl/rT3f6C.

- FHFA's "statutory mandates obligate" it to "[c]onserve and preserve the assets of the Enterprises while they are in conservatorship."  Statement of Melvin L. Watt, Dir., FHFA, Before the U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 11, 2017), https://goo.gl/h44qRf.

- FHFA has a "'preserve and conserve' mandate."  A FHFA STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIP:  THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING at 7 (Feb. 21, 2012), http://goo.gl/uXreKX ("A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIP").

- "By law, the conservatorships are intended to rehabilitate [Fannie and Freddie] as private firms."  Letter from Edward DeMarco, Acting Director, FHFA to Senators at 1 (Nov. 10, 2011), http://goo.gl/hbBe25.

- "The statutory role of FHFA as conservator requires FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to safety and soundness."  FHFA, REPORT TO CONGRESS:  2009 at 99 (May 25, 2010), http://goo.gl/YOOgzC.

- "As the conservator, FHFA's most important goal is to preserve the assets of Fannie Mae and Freddie Mac over the conservatorship period.  That is our statutory responsibility."  *The Present Condition and Future Status of Fannie Mae and Freddie Mac:  Hearing Before the Subcomm. of Capital Markets,*

*Ins. & Gov't Sponsored Enters. of the H. Comm. on Fin. Servs.*, 111th Cong.

136 (2009) (statement of James B. Lockhart III, Dir., FHFA).

- FHFA as conservator "preserves and conserves the assets and property of the
  Enterprises . . . and facilitates their financial stability and emergence from
  conservatorship."  FHFA, STRATEGIC PLAN:  2009-2014 at 33,
  http://goo.gl/UjCxf6.  "The conservatorship of Fannie Mae and Freddie Mac
  allows the FHFA to preserve the assets of the [Companies], ensure they focus
  on their housing mission and are positioned to emerge from conservatorship
  as financially strong . . . ."  *Id.* at 20.

39.     The Agencies similarly acknowledged FHFA's mandates as conservator in

internal documents produced in discovery and made available to the public.  Treasury, for

example, acknowledged that "FHFA as conservator is required to preserve assets" and that one

of the "[l]egal [c]onstraints" imposed upon FHFA is its "mandate[ ] to 'conserve assets.'"  FHFA

recognized that it "has a responsibility to take such actions as may be necessary to put the

Enterprises in a sound and solvent condition and to preserve and conserve their assets and

property."

40.     Under HERA, conservatorship is a status distinct from receivership, with very

different purposes, responsibilities, and restrictions.  When acting as a receiver, but *not* when

acting as a conservator, FHFA is authorized and obliged to "place the regulated entity in

liquidation and proceed to realize upon the assets of the regulated entity."  *Id.* § 4617(b)(2)(E).

The only "post-conservatorship outcome[] . . . that FHFA may implement today under existing

law," by contrast, "is to reconstitute [Fannie and Freddie] under their current charters."  Letter

from Edward J. DeMarco, Acting Director, FHFA, to Chairmen and Ranking Members of the

Senate Committee on Banking, Housing, and Urban Affairs and to the House Committee on

Financial Services 7 (Feb. 2, 2010).  In other words, receivership is aimed at winding down a

company's affairs and liquidating its assets, while conservatorship aims to rehabilitate it and

return it to normal operation.  This distinction between the purposes and authorities of a receiver

and a conservator is a well-established tenet of financial regulation and common law.  In our

nation's history, there has *never* been an example of a regulator forcing a healthy, profitable

company to remain captive in a perpetual conservatorship (in this instance, going on ten years)

while facilitating the looting and plundering of the company's assets by another federal agency

*and* simultaneously avoiding the organized claims process of a receivership.

41.     In promulgating regulations governing its operations as conservator versus

receiver of the Companies, FHFA specifically acknowledged the distinctions in its statutory

responsibilities as conservator and as receiver:  "A conservator's goal is to continue the

operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent

condition."  76 Fed. Reg. 35,724, 35,730.  In contrast, when FHFA acts as a receiver, the

regulation specifically provides that "[t]he Agency, as receiver, *shall* place the regulated entity in

liquidation . . . ."  12 C.F.R. § 1237.3(b) (emphasis added).  Consistent with this interpretation of

HERA, a FHFA Advisory Bulletin describes "the conservator's or receiver's powers and

responsibilities" as including "in the case of a conservator, to put the regulated entity in a sound

and solvent condition, and to carry on its business and preserve and conserve its assets, and in

the case of a receiver, to liquidate the regulated entity."

42.     During conservatorship FHFA has dual and potentially conflicting roles as the

Companies' conservator and regulator.  As conservator, FHFA's mission is to preserve and

conserve the Companies' assets and restore them to soundness and solvency.  In contrast, as

regulator, FHFA is charged with the public mission of ensuring that the Companies "foster liquid, efficient, competitive, and resilient national housing finance markets (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities)" and conduct their operations in a manner "consistent with the public interest."  12 U.S.C. § 4513(a)(1)(B).  The FDIC, which has similar dual roles, has in the past sought to manage this conflict by erecting a "firewall" between personnel tasked with working for the agency as conservator and other personnel tasked with working for the agency as regulator.  *See Plaintiffs in All Winstar-Related Cases at Court v. United States*, 44 Fed. Cl. 3, 7 n.5 (1999).  FHFA has not taken similar steps to protect the integrity of its conservatorship role and, as set forth in greater detail below, abandoned the traditional role of a conservator by disregarding the interests of the Companies when it took the actions that are the subject of this suit and by ceding its decision making authority to Treasury.

43.     On September 6, 2008, FHFA and Treasury persuaded the Companies' boards to consent to conservatorship.  As Former Secretary Paulson has explained, Treasury was the driving force behind the imposition of the conservatorships:  "FHFA had been balky all along [about the imposition of a conservatorship] . . . . We had to convince its people that [conservatorship] was the right thing to do, while making sure to let them feel they were still in charge."  HENRY M. PAULSON, JR., ON THE BRINK 6 (2010).  Given that the Companies were not in financial distress and were in no danger of defaulting on their debts, the Companies' directors were confronted with a Hobson's choice:  agree to conservatorship, or they would face "nasty lawsuits" and Treasury would refuse to provide the Companies with any capital if they needed it.  THE FINANCIAL CRISIS INQUIRY COMMISSION REPORT 320 (Jan. 2011).

The Agencies ultimately obtained the Companies' consent by threatening to seize them if they did not acquiesce and by informing them that the Agencies had already selected new CEOs and had teams ready to move in and take control.  In agreeing to the FHFA takeover, both Companies' boards understood that the "conservatorship" FHFA and Treasury proposed would be like all other federal conservatorships in American history—including those operated by FHFA's model agency, the FDIC—and that the Companies would be operated by their regulator acting in a fiduciary capacity for the benefit of all stakeholders, including private shareholders.

44.     In publicly announcing the conservatorship, FHFA acknowledged that the Companies' stock remains outstanding during conservatorship and "continue[s] to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship* 3, https://goo.gl/DV4nAt, and Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth," *id.* Director Lockhart testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest.  *Oversight Hearing to Examine Recent Treasury & FHFA Actions Regarding the Housing GSEs:  Hearing Before the H. Comm. on Fin. Servs.*, 110th Cong. 29–30, 34 (2008).

45.     FHFA also emphasized that the conservatorship was temporary:  "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship."  *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2. Investors were entitled to rely on these official statements of the purposes of the conservatorship—which were consistent with the long history of conservatorships—and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.

46.     In short, the Companies were not in financial distress when they were placed into conservatorship.  The Companies' boards acquiesced to conservatorship based on the understanding that FHFA, like any other conservator, would operate the Companies as a fiduciary with the goal of preserving and conserving their assets and managing them in a safe and solvent manner.  And in publicly announcing the conservatorships, FHFA confirmed that the Companies' private shareholders continued to hold an economic interest that could have value, particularly as the Companies generated profits in the future.

## C.     FHFA and Treasury Enter into the Purchase Agreements

47.     On September 7, 2008, Treasury and FHFA, acting in its capacity as conservator of Fannie and Freddie, entered into the Preferred Stock Purchase Agreements.

48.     In entering into the Purchase Agreements, Treasury exercised its temporary authority under HERA to purchase securities issued by the Companies.  *See* 12 U.S.C. §§ 1455(*l*), 1719(g).  To exercise that authority, the Secretary of the Treasury was required to determine that purchasing the Companies' securities was "necessary to . . . provide stability to the financial markets; . . . prevent disruptions in the availability of mortgage finance; and . . . protect the taxpayer."  12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B).  In making those determinations, the Secretary was required to consider six factors:

> (i) The need for preferences or priorities regarding payments to the Government.
> (ii) Limits on maturity or disposition of obligations or securities to be purchased.
> (iii) *The [Companies'] plan[s] for the orderly resumption of private market funding or capital market access*.
> (iv) The probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment.
> (v) *The need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]*.
> (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive

compensation and any such other terms and conditions as
appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (emphasis added).

49.     In approving the exercise of Treasury's temporary authority under HERA to
purchase securities of the Companies, Treasury Secretary Paulson determined (1) "[u]nder
conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2)
"Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent
operations"; and (3) "[c]onservatorship preserves the status and claims of the preferred and
common shareholders."  Action Memorandum for Secretary Paulson (Sept. 7, 2008).

50.     Treasury's authority under HERA to purchase the Companies' securities expired
on December 31, 2009.  See 12 U.S.C. §§ 1455(l)(4), 1719(g)(4).  After that date, HERA
authorized Treasury only "to hold, exercise any rights received in connection with, or sell"
previously purchased securities.  Id. §§ 1455(l)(2)(D), 1719(g)(2)(D).

51.     Treasury's PSPAs with Fannie and Freddie are materially identical.  Under the
original agreements, Treasury committed to provide up to $100 billion to each Company to
ensure that it maintained a positive net worth.  In particular, for quarters in which either
Company's liabilities exceed its assets under Generally Accepted Accounting Principles, the
PSPAs authorize Fannie and Freddie to draw upon Treasury's commitment in an amount equal to
the difference between its liabilities and assets.

52.     In return for Treasury's funding commitment, Treasury received 1 million shares
of Government Stock in each Company and warrants to purchase 79.9% of the common stock of
each Company at a nominal price.  Exercising these warrants would entitle Treasury to up to
79.9% of all future profits of the Companies, subject to the Companies' obligation to satisfy their
dividend obligations with respect to the Government Stock and Preferred Stock and to share the

remaining 20.1% of those profits with private common shareholders.  As Treasury noted in entering the PSPAs, the warrants "provide potential future upside to the taxpayers."  Action Memorandum for Secretary Paulson (Sept. 7, 2008).

53.     Treasury's Government Stock in each Company had an initial liquidation preference of $1 billion.  In other words, Treasury took an upfront fee of $1 billion from each of the Companies before either Company received any funding from Treasury in return.  This liquidation preference increases by one dollar for each dollar the Companies receive from Treasury pursuant to the PSPAs.  In the event the Companies liquidate, Treasury is entitled to recover the full liquidation value of its shares before any other shareholder may recover anything.

54.     While Treasury's commitment remains outstanding, Fannie and Freddie generally are prohibited from paying down amounts added to the liquidation preference due to draws from Treasury's commitment.  *See* Fannie and Freddie Government Stock Certificates § 3(a).  This feature of the original PSPAs would play an important role in enabling the government to permanently increase the size of the dividends on the Government Stock by artificially reducing the Companies' reported net worth through the accounting manipulations discussed below.

55.     In addition to the liquidation preference, the original PSPAs provided for Treasury to receive either a cumulative cash dividend equal to 10% of the value of the outstanding liquidation preference or a stock dividend.  If the Companies decided not to pay the dividend in cash, the value of the dividend would be added to the liquidation preference— effectively amounting to an in-kind dividend payment of additional Government Stock.  After an in-kind dividend payment, the dividend rate would increase to 12% until such time as full cumulative dividends were paid in cash, at which point the rate would return to 10%.  The plain

terms of the PSPAs thus make clear that Fannie and Freddie never were required to pay a cash dividend to Treasury but rather had the discretion to pay dividends in kind. In other words, the Companies were never under any obligation to pay a fixed 10% cash dividend to Treasury. The option to pay Treasury's dividend in-kind without limitation gave Fannie and Freddie all the flexibility they needed to honor their dividend obligations without needlessly depleting Treasury's commitment.

56.     Numerous materials prove beyond any reasonable doubt that the Agencies recognized that the PSPAs were designed, as their express terms plainly provide, to allow the payment of dividends in kind—in additional senior preferred stock—rather than in cash. In an internal October 2008 email to Mario Ugoletti—who was then a Treasury official, but later moved to FHFA and was a key point of contact with Treasury in the development of the Net Worth Sweep—another Treasury official indicated that Treasury's consultant wanted to know "whether we expect [Fannie and Freddie] to pay the preferred stock dividends in cash or to just accrue the payments." Mr. Ugoletti did not forget about this feature of the PSPAs when he moved to FHFA. Indeed, he acknowledged the option to pay dividends "in kind" in an email that he sent the very day the Net Worth Sweep was announced. In a similar vein, a document attached to a September 16, 2008, email between FHFA officials expressly states that PSPA dividends may be "paid in-kind." In an October 2008 email to Treasury and FHFA officials, a Treasury consultant sought to clarify whether Fannie and Freddie "intend[ed] to pay cash at 10 percent or accrue at 12 percent as a matter of policy." An internal Treasury document says that the dividend rate "may increase to the rate of 12 percent if, in any quarter, the dividends are not paid in cash." And an internal FHFA document says that Treasury's senior stock pays "10 percent cash dividend (12 percent payment-in-kind)."

57.     Documents that the Agencies placed in the public domain also support this understanding of the payment-in-kind option.  Upon entering the PSPAs, Treasury released a fact sheet stating that "[t]he senior preferred stock shall accrue dividends at 10% per year.  The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash . . . ."  U.S. TREASURY DEP'T OFFICE OF PUB. AFFAIRS, FACT SHEET:  TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT (Sept. 7, 2008), https://goo.gl/ynb3TC. And a presentation Treasury included in the administrative record in a case in the District of the District of Columbia acknowledges that the dividend rate of the PSPAs would be 12% "if elected to be paid in kind."  Treasury Presentation to SEC, GSE Preferred Stock Purchase Agreements (PSPA), Overview and Key Considerations at 9, June 13, 2012.

58.     The Companies shared this understanding of the terms of their agreements with Treasury.  Fannie's and Freddie's Chief Financial Officers ("CFOs") have testified that they were aware of the payment-in-kind option.  For example, Freddie documents say that "[t]he dividend becomes 12% if Freddie Mac is unable to pay the dividend through organic income." Similarly, Fannie documents say that Treasury's preferred stock "has an annual dividend rate of 10%, which could increase to 12% if not paid in cash," and that "[i]f at any time . . . the Company does not pay the cash dividends in a timely manner, . . . the annual dividend rate will be 12%."

59.     An in-kind dividend payment would not decrease Treasury's funding commitment because only when the Companies receive "funding under the Commitment" does its size decrease.  Fannie and Freddie Amended and Restated Senior Preferred Stock Purchase Agreements ("PSPA") § 1.  Jeff Foster, one of the architects of the Net Worth Sweep at Treasury, accordingly has testified in a deposition that he could not identify any "problems of the

circularity [in dividend payments that] would have remained had the [payment-in-kind] option been adopted." Thus, as the Congressional Research Service has acknowledged, under the PSPAs' original terms the Companies could "pay a 12% annual senior preferred stock dividend indefinitely." N. ERIC WEISS, CONG. RESEARCH SERV., RL34661, FANNIE MAE'S AND FREDDIE MAC'S FINANCIAL PROBLEMS (Aug. 10, 2012). In other words, because of the payment-in-kind option, there was no risk—none whatsoever—that the PSPAs would force Fannie and Freddie to exhaust Treasury's funding commitment to facilitate the payment of dividends.

60.     The PSPAs also provided for the Companies to pay Treasury a quarterly periodic commitment fee "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." PSPA § 3.2(a). The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury has exercised this option and has never received a periodic commitment fee under the PSPAs. Even if the fee had been charged, the Companies were always free under the express terms of the PSPAs to pay the fee in-kind with additional senior preferred stock rather than in cash. *See* PSPA § 3.2(c) ("At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock . . . ."). This is a fact that Freddie's auditor recognized in a document produced in this case.

61.     Finally, the PSPAs also grant Treasury substantial control over FHFA's operation of Fannie and Freddie and the conservatorships. In particular, from their inception through the adoption of the Net Worth Sweep, the PSPAs provided as follows:

> From the Effective Date until such time as the Senior Preferred Stock shall have been repaid or redeemed in full in accordance with its terms:

5.1. *Restricted Payments.*  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, declare or pay any dividend (preferred or otherwise) or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of Seller's Equity Interests (other than with respect to the Senior Preferred Stock or the Warrant) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any of Seller's Equity Interests (other than the Senior Preferred Stock or the Warrant), or set aside any amount for any such purpose.

5.2. *Issuance of Capital Stock.*  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell or issue Equity Interests of Seller or any of its subsidiaries of any kind or nature, in any amount, other than the sale and issuance of the Senior Preferred Stock and Warrant on the Effective Date and the common stock subject to the Warrant upon exercise thereof, and other than as required by (and pursuant to) the terms of any binding agreement as in effect on the date hereof.

5.3. *Conservatorship.*  Seller shall not (and Conservator, by its signature below, agrees that it shall not), without the prior written consent of Purchaser, terminate, seek termination of or permit to be terminated the conservatorship of Seller pursuant to Section 1367 of the FHE Act, other than in connection with a receivership pursuant to Section 1367 of the FHE Act.

5.4. *Transfer of Assets.*  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "Disposition"), other than Dispositions for fair market value:

(a) to a limited life regulated entity ("LLRE") pursuant to Section 1367(i) of the FHE Act;

(b) of assets and properties in the ordinary course of business, consistent with past practice;

(c) in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(d) of cash or cash equivalents for cash or cash equivalents; or

(e) to the extent necessary to comply with the covenant set forth in Section 5.7 below.[3]

---

[3] The Third Amendment, discussed below, added a provision to Section 5.4 permitting the Companies to sell up to $250,000,000 in assets in a single transaction without Treasury's consent.

5.5.  *Indebtedness*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, incur, assume or otherwise become liable for (a) any indebtedness if, after giving effect to the incurrence thereof, the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis would exceed 110.0% of the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis as of June 30, 2008 or (b) any Indebtedness if such Indebtedness is subordinated by its terms to any other Indebtedness of Seller or the applicable subsidiary.  For purposes of this covenant the acquisition of a subsidiary with Indebtedness will be deemed to be the incurrence of such Indebtedness at the time of such acquisition.

5.6.  *Fundamental Changes*.  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, (i) merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, (ii) effect a reorganization or recapitalization involving the common stock of Seller, a reclassification of the common stock of Seller or similar corporate transaction or event or (iii) purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or substantially all of the assets of any other Person or any division, unit or business of any Person.

. . .

5.8.  *Transactions with Affiliates*.  Seller shall not, and shall not permit any of its subsidiaries to, without the prior written consent of Purchaser, engage in any transaction of any kind or nature with an Affiliate of Seller unless such transaction is (i) Pursuant to this Agreement, the Senior Preferred Stock or the Warrant, (ii) upon terms no less favorable to Seller than would be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of Seller or (iii) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence as of the date hereof.

PSPAs at 8–10.

62.     As Freddie has observed, these covenants "restrict [the Companies'] business activities" and prevent them from taking certain actions even at the direction of FHFA "without prior written consent of Treasury."

63.     On May 6, 2009, FHFA and Treasury amended the PSPAs to increase Treasury's funding commitment to each Company from $100 billion to $200 billion.  On December 24, 2009—one week before Treasury's temporary statutory authority to purchase the Companies'

securities expired—the agencies again amended the terms of Treasury's funding commitment.

Instead of resetting the commitment at a specific dollar amount, the second amendment

established a formula to allow Treasury's total commitment to each Company to exceed (but not

fall below) $200 billion depending upon any net worth deficiencies experienced in 2010, 2011,

and 2012, and any surplus existing as of December 31, 2012.  In an action memorandum

explaining the second of these two amendments, Treasury stated that the increased funding

commitment was "a strong statement that the U.S. Government will make sure that the

institutions continue to function" and that it was not expected that the Companies would require

any additional increase because "[i]t is unlikely that either [Company] will reach the $200 billion

existing cap unless the housing market worsens sharply from here."  As Treasury acknowledged

in the same document, expiration of its authority to purchase the Companies' shares at the end of

2009 meant that its "ability to make further changes to the PSPAs . . . [was] constrained."

Action Memorandum for Secretary Geithner at 3, 4 (Dec. 22, 2009).

**D.**     **The Agencies Force Accounting Changes to Increase the Companies' Draws**
        **from Treasury**

        64.     Beginning in the third quarter of 2008—when FHFA took control of the

Companies as conservator—the Companies began to make wildly pessimistic and obviously

unrealistic assumptions about their future financial prospects.  These false assumptions triggered

adjustments to the Companies' balance sheets, most notably write-downs of significant tax assets

and the establishment of large loan loss reserves, which caused the Companies to report non-cash

losses.  Although reflecting nothing more than unjustifiable accounting assumptions about the

Companies' future prospects and having no effect on the cash flow the Companies were

generating, these non-cash losses temporarily and misleadingly decreased the Companies'

reported net worth by in excess of a hundred billion dollars.  For example, in the first year and a

half after imposition of the conservatorship, Fannie reported $127 billion in losses, but only $16 billion of that amount reflected actual credit-related losses.  These excessive non-cash losses resulted in excessive purchases of Government Stock by Treasury and increased Fannie's and Freddie's total liabilities.  Had the Companies' net worth been properly calculated under Generally Accepted Accounting Principles, their liabilities would never have exceeded their assets.  In 2010, during the period when these improper accounting adjustments were being made, FHFA also decided to order the Companies to de-list their shares from the New York Stock Exchange, a decision that had no effect on the stock's underlying economic value but caused a precipitous decline in its market price.

65.     By the end of 2011, the Companies' reported net worth had fallen by $100 billion as a result of the decision made shortly after imposition of the conservatorship to write down the value of their deferred tax assets.  A deferred tax asset is an asset that may be used to offset future tax liability.  Under Generally Accepted Accounting Principles, if a company determines that it is unlikely that some or all of a deferred tax asset will be used, the company must establish a "valuation allowance" in the amount that is unlikely to be used.  In other words, a company must write down a deferred tax asset if it is unlikely to be used to offset future taxable profits. Shortly after FHFA took control of the Companies, FHFA made the implausible assumption that the Companies would not generate taxable income and that their deferred tax assets were therefore worthless.  That incomprehensibly flawed decision dramatically reduced the Companies' reported net worth.

66.     The decision to designate excessive loan loss reserves was another important factor in the artificial decline in the Companies' reported net worth during the early years of conservatorship.  Loan loss reserves are an entry on the Companies' balance sheets that reduces

their reported net worth to reflect anticipated losses on the mortgages they own. Beginning when FHFA took control of the Companies in the third quarter of 2008 and continuing through 2009, the Companies were forced to provision additional loan loss reserves far in excess of the credit losses they were actually experiencing. The extent to which excess loan loss reserve provisioning reduced the Companies' reported net worth is dramatically illustrated by the following chart, which compares the Companies' loan loss reserve provisioning to their actual credit losses. The excessive nature of these loan loss provisions was readily apparent by 2012, and the inevitable reversals would appear as income on the Companies' balance sheet.

67.   Despite the fact that the Companies' mortgage portfolios were safer than the similar portfolios held by banks involved in the mortgage business, banks were much more accurate—and, with the consent of their regulators, far less aggressive—in reducing their net worth to reflect expected loan losses.

68.   In June 2011, FHFA officials observed in an email exchange that Freddie was taking loan loss reserves in excess of what its own financial models supported but that Freddie would "face some hard questioning from FHFA" if it sought "to take down the reserves in the current clime." And in November 2011, a Treasury consultant that had reviewed Fannie financial projections previously used to justify loan loss reserve decisions observed that "actual net losses were typically lower than predicted in the optimistic and base cases . . . and far lower than forecasted in the stress cases."

69.   By June of 2012, the Companies had drawn a total of $187 billion from Treasury, in large part to fill the holes in the Companies' balance sheets created by these artificial non-cash losses imposed under conservatorship. Approximately $26 billion of these combined amounts were drawn simply to pay the 10% dividend payments owed to Treasury. (In other words, FHFA

requested draws to pay Treasury this $26 billion in cash that was not otherwise available rather

than electing to pay the dividends in kind.  Had the dividends been paid in kind, FHFA would

not have had to draw from—and, consequently, reduce the remaining size of—Treasury's

commitment to pay them.) Thus, Treasury actually disbursed approximately $161 billion to the

Companies, primarily reflecting temporary changes in the valuation estimates of assets and

liabilities.

70.     From the outset of the conservatorship through the imposition of the Net Worth

Sweep, the Companies' net operating revenue exceeded their net operating expenses, and their

actual losses were never so severe that they would have had a negative net worth but for the

excessively pessimistic and unjustified treatment of deferred tax assets and loan loss reserves.  In

other words, despite manipulations made to the Companies' balance sheets while they were

under the government's control, they never had any difficulty paying their debts and other

obligations.  Over time, the Companies' cash receipts have consistently exceeded their expenses.

**E.     The Companies Return to Profitability and Stability**

71.     By 2012, Fannie and Freddie began generating consistent profits notwithstanding

their overstated loss reserves and the write-down of their deferred tax assets.  In fact, in the first

two quarters of 2012, the Companies posted sizable profits totaling more than $11 billion.  What

is more, the Companies were well-positioned to continue generating robust profits for the

foreseeable future.

72.     Fannie's and Freddie's financial results are strongly influenced by home prices.

And as FHFA's own Home Price Index shows, the market reached its bottom in 2011:



73.     The improving housing market was coupled with stricter underwriting standards at Fannie and Freddie.  As a result—and as the Agencies knew—Fannie- and Freddie-backed loans issued after 2008 had dramatically lower serious delinquency rates than loans issued between 2005 and 2008.  To appreciate the significance of this point, it is useful to understand that the mortgages the Companies purchase and securitize in a given year are sometimes collectively referred to as that year's "vintage."  Some vintages are more profitable than others; the Companies make more money from mortgages purchased in years when borrowers were on the whole more creditworthy and overall home prices were lower (factors that reduce the rate at which borrowers default).  Although each vintage generates income for the Companies for many years (the Companies mostly purchase 30-year mortgages), it is possible to make an early assessment of how profitable a given vintage will be by examining the vintage's default rate in its first few years.  In this manner, the Companies and the Agencies were able to examine the quality of the mortgage vintages from after 2008, and by 2012 they fully understood that those newer vintages would be highly profitable.

74.     The strong quality of these newer vintages of mortgages boded well for Fannie's and Freddie's future financial prospects.  Indeed, as early as June 2011, a Treasury official observed that "[a]s Fannie and Freddie continue to work through their legacy book of business,"—i.e., vintages from before 2009—"the actual realized losses are expected to decline significantly."  And an internal Treasury document similarly observed that the Companies' losses during the early years of conservatorship "are almost entirely attributable to loans that were originated and guaranteed before conservatorship" and that "[t]he 2006, 2007, and 2008 vintages account for over 70% of all credit losses."

75.     Together, the Companies' return to robust profitability and the stable recovery of the housing market—which resulted in lower delinquency rates than prior to the 2008 crisis— showed in early 2012 that the Companies could in time redeem Treasury's Government Stock and that value remained in their Preferred Stock and Common Stock.  Indeed, a presentation sent to senior Treasury officials in February 2012 indicated that "Fannie and Freddie could have the earnings power to provide taxpayers with enough value to repay Treasury's net cash investments in the two entities."  The Companies' financial performance and outlook only further improved in the ensuing months.  In the weeks leading up to the Net Worth Sweep, one Treasury official observed that Freddie's second quarter 2012 results were "very positive" and a report circulated among senior FHFA officials said that the agency deserved a "high five" for the Companies' strong financial outlook.

76.     As a result of Fannie's and Freddie's return to sustained profitability, it was clear that the overly pessimistic accounting decisions weighing down the Companies' balance sheets would have to be reversed.  Indeed, by early August 2012, the Agencies knew that Fannie and Freddie were poised to generate massive profits well in excess of the Companies' dividend

obligations to Treasury—profits that would make the $11 billion the Companies generated in the first half of 2012 look small by comparison.

77.     By August 2012, the Agencies knew that the Companies' reserves for loan losses far exceeded their actual losses.  These excess loss reserves artificially depressed the Companies' net worth, and reversing them would increase the Companies' net worth accordingly.  Indeed, on July 19, 2012, a Treasury official observed that the release of loan loss reserves could "increase the [Companies'] net [worth] substantially."  A Treasury document from early August 2012 likewise stated that the Companies were about to report "[r]ecord earnings" that would be "driven by [a] large credit loss reserve release."  And the Agencies were focused on this issue.  An internal briefing memorandum prepared for Under Secretary Miller in advance of August 9, 2012 meetings with Fannie and Freddie executives reveals that the number one question Treasury had for the Companies was "how quickly they forecast releasing credit reserves."  And a handwritten note on a presentation from the August 9 meeting with Freddie says to "expect material release of loan loss reserves in the future."  FHFA also knew that loan loss reserve releases would boost the Companies' profits going forward, as FHFA officials attended a meeting of Freddie's Loan Loss Reserve Governance Committee on August 8, 2012.  FHFA's knowledge of the status of the Companies' loan loss reserves is also dramatically illustrated by a July 2012 FHFA presentation showing that starting in 2008 the Companies had set aside loan loss reserves far in excess of their actual losses.

78.     Another principal driver of the outsized profits that the Companies would inevitably generate was the mandated release of the Companies' deferred tax assets valuation allowances.  By mid-2012, Fannie and Freddie had combined deferred tax assets valuation allowances of nearly $100 billion.  Under relevant accounting rules, those valuation allowances

would have to be reversed if the Companies determined that it was more likely than not that they would generate taxable income and therefore be able to use their deferred tax assets.  The Treasury Department was intimately familiar with these issues, having seen such a reversal in February 2012 in connection with its massive investment in AIG.  In 2011, it was also known within Fannie that the valuation allowance would be reversed; the only question was the timing.

79.     The Companies' improved prospects came into even sharper focus on August 9, 2012, when Under Secretary Miller and other senior Treasury officials had meetings with the senior executives of both Fannie and Freddie.  During the meeting with Fannie's management, Treasury was presented with ten-year projections showing the Company **earning** an average of more than $11 billion per year from 2012 through 2022 and having over $116 billion left of Treasury's funding commitment at the end of that time period.  Those projections are reproduced below:

## Annual Detail of Cumulative Dividends and SPSPA Draws

*(S in Billions)*

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 13.0 | 12.5 | 13.5 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| Preferred Dividend Payment | 13.1 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.3 | 12.5 |
| Residual Equity | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.8 | 2.7 | 1.9 | 0.5 | 0.0 | 0.0 |
| Cumulative Dividends | 10.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.1 | 104.3 | 116.6 | 128.8 | 141.1 | 153.6 |
| Cumulative SPSPA Draws | (116.1) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (122.9) | (124.3) |
| Cumulative Dividends Less Draws | (96.3) | (84.7) | (75.8) | (65.9) | (53.3) | (41.7) | (28.4) | (17.2) | (4.5) | 7.3 | 18.3 | 28.8 |
| SPSPA Funding Cap | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| Remaining Funding under SPSPA | 124.8 | 124.8 | 122.0 | 119.7 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 118.1 | 116.1 |

Note: 2012-2016 figures from Fannie Mae July BOD corporate forecast. 2017-2022 figures are based on simplifying assumptions derived from trends observed within the 2012-2016 horizon.

*(S in Billions)*

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 8.2 | 8.6 | 9.0 | 8.7 | 8.3 | 7.7 | 7.1 | 6.7 | 6.5 |
| Preferred Dividend Payment | 16.3 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 |
| Residual Equity | 0.0 | 0.0 | 0.4 | 1.7 | 3.5 | 5.6 | 6.9 | 7.9 | 8.1 | 7.9 | 7.2 | 6.3 |
| Cumulative Dividends | 16.3 | 23.7 | 31.1 | 38.4 | 45.8 | 53.2 | 60.6 | 68.0 | 75.4 | 82.8 | 90.2 | 97.6 |
| Cumulative SPSPA Draws | (72.2) | (116.1) | (73.0) | (73.0) | (73.0) | (71.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) |
| Cumulative Dividends Less Draws | (55.9) | (92.4) | (41.9) | (34.5) | (27.1) | (17.7) | (12.3) | (4.9) | 2.5 | 9.9 | 17.3 | 24.7 |
| SPSPA Funding Cap | 220.5 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 |
| Remaining Funding under SPSPA | 148.3 | 105.2 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 |

Note: 2012-2022 figures are based on simplifying assumptions derived from Fannie Mae forecast trends and observed relationships between key Fannie Mae and Freddie Mac performance metrics. Reported 2011 results re-aligned as necessary to correspond to Fannie Mae management reporting.

Note: Numbers may not foot due to rounding.

7

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



80.     Furthermore, Treasury learned that Fannie's near-term earnings likely would be even higher than those in the projections due to the release of the Companies' deferred tax assets valuation allowance.  During the August 9 meeting, Fannie CFO Susan McFarland informed Treasury that the criteria for reversing the deferred tax assets valuation allowance could be met in the not-so-distant future.  And when asked for more specifics by Under Secretary Miller, Ms.

McFarland stated that the reversal would be probably in the $50-billion range and probably sometime mid-2013, an assessment that proved remarkably accurate.

81.     Like Treasury, FHFA was in possession of information showing that the Companies would soon generate substantial profits, thus making it inevitable that they would release their deferred tax asset valuation allowances.  On July 13, 2012, Bradford Martin, Principal Advisor in FHFA's Office of Conservatorship Operations, broadly circulated within FHFA minutes from a July 9, 2012 Fannie executive management meeting.  The recipients of the email included Acting Director DeMarco and Mr. Ugoletti.  The minutes stated that Fannie Treasurer David Benson "referred to the next 8 years as likely to be 'the golden years of GSE earnings.'"  Projections substantially similar to those shared with Treasury on August 9 were attached to the email containing the following slide:



82.     Those projections expressly stated the assumption that Fannie would not be paying taxes because it would be using its deferred tax assets—and if Fannie was expecting to use its deferred tax assets, it would have to release the valuation allowance it had established for them.  FHFA knew this; indeed, FHFA accountants were monitoring the Companies' deferred tax assets situation, and FHFA knew that the Companies' audit committees were assessing the status of the valuation allowances on a quarterly basis.  FHFA also likely was aware of AIG's 2012 reversal of its deferred tax asset valuation allowance.  Indeed, in an August 14, 2012 email, an FHFA official indicated that both Companies had discussed the issue of "re-recording certain deferred tax assets that had been written off" during their most recent Board meetings "based on the view that they were going to be profitable going forward."  In addition, Ms. McFarland testified that in July 2012 she would have mentioned the potential release of the valuation allowance at a Fannie executive committee meeting attended by at least one FHFA official, and she also testified that FHFA was on notice of the statement she made to Under Secretary Miller on August 9, 2012 regarding the potential release of the valuation allowance.

83.     Rather than acknowledging the projections just discussed, the government has instead sought to support the Net Worth Sweep by pointing to other financial projections that its own documents show were outdated and unreliable by August 2012.  In other litigation, the government has relied on a set of "June 13, 2012" projections that discovery in this case revealed were taken verbatim from projections prepared by Treasury consultant Grant Thornton in November 2011 using data from September 2011.  Although not as positive as the more updated projections discussed above, the Grant Thornton analysis projected combined profits at the Companies of over $20 billion in 2014, with annual profits then gradually declining to a long-term figure of about $13.5 billion.  Profits of this magnitude necessarily would have led to the

reversal of the valuation allowances.  And Treasury took notice.  Hand-written notes on a Grant Thornton document produced by Treasury displaying Freddie's results through the first quarter of 2012 anticipate that Freddie could release its valuation allowance "probably [in] 2013, 2014." The agenda for a meeting indicates that by May 2012 Treasury and Grant Thornton were discussing "[r]eturning the deferred tax asset to the GSE balance sheets" and that Treasury planned to discuss this issue with FHFA and the Companies in early June.  And a Grant Thornton document sent to Treasury on June 29, 2012 recognizes that two "key issues" for determining the value of Treasury's investment in 2012 were "whether and when the GSEs will return their deferred tax assets to their balance sheets" and "whether and when the GSEs will become taxpaying entities."

84.    By August 2012, it was apparent that the Grant Thornton projections based on data from September 2011 drastically underestimated Fannie's and Freddie's earning capacity. The manager of Grant Thornton's valuation services to Treasury, Anne Eberhardt, admitted in a deposition that the projections based on September 2011 data were no longer valid 11 months later, and Fannie's Chief Financial Officer, the highest ranking and responsible financial expert at the Company, Susan McFarland, has testified that it was particularly important to have fresh financial forecasts at that time.  Mr. Ugoletti and Ms. Eberhardt likewise have testified to the importance of using up-to-date financial information, and Mr. DeMarco testified that FHFA as conservator was "constantly responding to a changing economic environment."  And as Mr. DeMarco also testified, one change that took place between September 2011 and mid-August 2012 "was strengthening in the housing market."  Mr. Ugoletti also has admitted that FHFA's own projections consistently were overly pessimistic leading up to August 2012.  Treasury and

FHFA therefore knew that Fannie and Freddie were poised to be even more profitable than Grant Thornton had projected in 2011.

85.     In other litigation, the government has also relied on a set of financial projections sent to Secretary Geithner on June 6, 2012, that showed that starting in 2018 Fannie would report only $4.1 billion in comprehensive income per year.

86.     In sum, by August 2012 the Agencies knew that Fannie and Freddie were poised to add tens of billions of dollars of deferred tax assets to their balance sheets and to reverse billions of dollars of loan loss reserves.  Thanks to these inevitable accounting decisions, coupled with Fannie's and Freddie's strong earnings from their day-to-day operations, the Companies anticipated that they would be able to pay their 10% dividends to Treasury without drawing on Treasury's funding commitment in the future, and dividend payments on the Government Stock did not threaten to erode Treasury's unused funding commitment.

87.     In addition to the release of loan loss reserves and deferred tax assets valuation allowances, Fannie and Freddie also had sizeable assets in the form of claims and suits brought by FHFA as conservator relating to securities law violations and fraud in the sale of private-label securities to Fannie and Freddie between 2005 and 2007.  In 2013 and 2014, the Companies recovered over $18 billion from financial institutions via settlements of such claims and suits. The Companies, FHFA, and Treasury knew in August 2012 that the Companies would reap substantial profits from such settlements.

**F.      FHFA and Treasury Amend the PSPAs to Expropriate Private Shareholders' Investment and Ensure Fannie and Freddie Cannot Exit Conservatorship**

88.     With Fannie's and Freddie's return to consistent and indeed record profitability, the holders of the Companies' Preferred Stock and Common Stock had reason to believe and expect that they would in time receive a return on their investment.  Moreover, the Companies'

return to profitability led to a reasonable expectation that they would eventually be healthy

enough to redeem Treasury's Government Stock, exit conservatorship, and be "return[ed] to

normal business operations," as FHFA's Director had vowed when the conservatorship was

created.

89.     These reasonable and realistic expectations were short-lived, however, not

because of any change in the outlook for the housing market or broader economy, nor because of

any change in the financial performance of Fannie or Freddie, but rather because of the

government's own self-dealing.

90.     On August 17, 2012, within days after the Companies had announced their return

to profitability and just as it was becoming clear that they had regained the earnings power to

redeem Treasury's Government Stock and exit conservatorship, the Agencies unilaterally

amended the PSPAs for a third time.

91.     The centerpiece of this "Third Amendment" was the Net Worth Sweep.  The Net

Worth Sweep fundamentally changed the nature of Treasury's investment in the Companies

and effectively nationalized the Companies.  Instead of quarterly dividend payments at an

annual rate of 10% (if paid in cash) or 12% (if paid in kind) of the total amount of Treasury's

liquidation preference, the Net Worth Sweep entitles Treasury to *all—100%*—of the

Companies' existing net worth and future profits.  Beginning January 1, 2013, the Companies

have been required to pay Treasury a quarterly dividend equal to their *entire net worth*, minus a

capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.  (In

December 2017, FHFA and Treasury amended the PSPAs a fourth time to reset the capital

reserve amount to $3 billion beginning in the first quarter of 2018.  This change does not

materially affect the claims in this litigation.)

92.     The Companies did not receive any meaningful consideration for the imposition of the Net Worth Sweep.  Because the Companies always had the option to pay dividends "in kind" at a 12% interest rate, the Net Worth Sweep did not provide the Companies with any additional flexibility or benefit.

93.     To be sure, the Net Worth Sweep provides that the Companies will not have to pay a periodic commitment fee under the PSPAs while the Net Worth Sweep is in effect.  But Treasury had consistently waived the periodic commitment fee before the Net Worth Sweep, and it could only set the amount of such a fee with the agreement of the Companies and at a market rate.  And that rate likely would have been, at most, a small fraction of the outstanding amount of Treasury's commitment.  Freddie forecasted its "sensitivity" to imposition of a periodic commitment fee as follows:  "Our sensitivity to a commitment fee based on remaining commitment available beginning in 2013 of $149 billion shows that a 25 bps fee results in a $0.4 billion annual impact on Stockholders' Equity."  This figure is consistent with other crisis-era commitment fees:  For example, the government's arrangement with Bank of America provided a commitment fee of only 20 bps.  *See* Summary of Terms, https://www.federalreserve.gov/ newsevents/pressreleases/files/bcreg20090115a1.pdf.  Further, the purpose of the fee was to compensate Treasury for its ongoing support in the form of the commitment to invest in the Companies' Government Stock.  By the time of the Net Worth Sweep, the 10% return on the Government Stock and the warrants for 79.9% of the common stock provided a more than adequate return on the government's stand-by commitment, and thus any additional fee would have been inappropriate.  In August of 2012, the Companies had returned to stable profitability and were no longer drawing from Treasury's commitment.  Given the Companies' return to profitability, the market rate for the periodic commitment fee in 2012 and after would have been

zero.  Finally, even if a market-rate fee had been agreed between Treasury and FHFA and imposed pursuant to the PSPA, the Companies had sufficient market power to pass the entire amount of this fee through to their customers—as the Companies do for other operating and financing costs—without affecting profitability or the value of the Companies' equity securities.

94.     The Net Worth Sweep has had far-reaching effects.  These effects were intended and anticipated by FHFA and Treasury, and the Agencies adopted the Net Worth Sweep in furtherance of their policy objectives as agencies of the federal government.

**1.      The Net Worth Sweep eliminated entirely the economic interests in Fannie and Freddie held by the Companies' private shareholders.**

95.     The quarterly sweep of the Companies' net worth eliminates the Companies' capital and ensures that there never will be sufficient funds for the Companies to pay a dividend to private shareholders.  It also ensures that private shareholders will receive nothing in the event of liquidation, as Treasury's Government Stock entitles it to an additional dividend payment *plus* its liquidation preference in the event of liquidation.  Government Stock Certificate § 8.  The dividend payment will leave Fannie and Freddie with negligible capital well shy of the government's nearly $200 billion liquidation preference, guaranteeing that there will be nothing left for private shareholders.  In light of this reality, it is not surprising that, Mr. Lockhart— FHFA's former Director—told a reporter that the Companies' privately-owned stock "is worthless and should be worthless."

96.     Upon its announcement, Treasury emphasized that the Net Worth Sweep would ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012), https://goo.gl/NDAKhQ.  The necessary corollary to this, of course, is that nothing would be left

for private shareholders.  Unbeknownst to the public, this was a long-term Treasury goal—a goal contrary to the historical treatment of entities in conservatorship.  Indeed, as early as December 2010, an internal Treasury memorandum acknowledged the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future."  Action Memorandum for Secretary Geithner at 2 (Dec. 20, 2010).

97.     FHFA shared Treasury's goal of advancing the government's interests and ensuring that private shareholders would not benefit from their stock ownership.  In its 2012 report to Congress, for example, FHFA explained that the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers."  FHFA, REPORT TO CONGRESS:  2012 at 1 (June 13, 2013), https://goo.gl/ocyB9J.  And while FHFA had earlier resolved to operate Fannie and Freddie with a view toward "minimiz[ing] losses on behalf of taxpayers," A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS at 7, the Net Worth Sweep indicates that the agency in fact is operating them to maximize taxpayer profits at the expense of private shareholders.  Director Watt summed up the situation succinctly when stating that he does not "lay awake at night worrying about what's fair to the shareholders" but rather focuses on "what is responsible for the taxpayers."  C-SPAN, Newsmakers with Mel Watt, at 9:00-9:27 (May 16, 2014), http://goo.gl/s3XWqi.  Consistent with this understanding of FHFA's goals, it stated that the Net Worth Sweep was intended to "fully capture financial benefits for taxpayers."

**2.     The Net Worth Sweep not only destroyed the economic interests of Fannie's and Freddie's private shareholders but also transferred their interests to the federal government, resulting in Fannie and Freddie being wholly nationalized entities.**

98.     As a Staff Report from the Federal Reserve Bank of New York acknowledged, the Net Worth Sweep "effectively narrows the difference between conservatorship and nationalization, by transferring essentially all profits and losses from the firms to the Treasury."

W. Scott Frame, et al., *The Rescue of Fannie Mae and Freddie Mac* at 21, FED. RES. BANK OF

N.Y. STAFF REP., no. 719 (Mar. 2015), https://goo.gl/DKBlQ1.  Fortune similarly has reported

that the Net Worth Sweep "effectively nationalized" the Companies.  Indeed, the government

itself has stated in a brief in another case that an "interest in residual profits is the defining

feature of an equity interest in a corporation."  Reply Brief of the United States at 24, *Starr Int'l

Co. v. United States*, No. 15-5103 (Fed. Cir. June 1, 2016).  After the Net Worth Sweep,

Treasury has the right to all residual profits, and it hence owns all the equity.  All other equity

interests have been eliminated.

    **3.**    **The nationalization effected by the Net Worth Sweep has enriched the
federal government to the tune of *$124 billion* to date.**

    99.    As the Agencies anticipated, Fannie and Freddie have been extraordinarily

profitable since the imposition of the Net Worth Sweep.  From the third quarter of 2012 through

the fourth quarter of 2017, Fannie and Freddie have reported total comprehensive income of

$134 billion and $91 billion, respectively—numbers that include the release of the Companies'

deferred tax assets valuation allowances, which in 2013 added over $50 billion and $20 billion to

Fannie's and Freddie's earnings, respectively.  The Companies' staggering net worth in 2013,

2014, and all subsequent years has been no higher than the Agencies anticipated when they

imposed the Net Worth Sweep in August 2012.

    100.    Because of Fannie's and Freddie's tremendous profitability, the Net Worth Sweep

dividend payments to Treasury have been enormous, as the following chart demonstrates:

**Dividend Payments Under the Net Worth Sweep
(in billions)**

|      |    | Fannie | Freddie | Combined |
| ---- | -- | ------ | ------- | -------- |
| 2013 | Q1 | $4.2   | $5.8    | $10.0    |
|      | Q2 | $59.4  | $7.0    | $66.4    |

|        |    |        |        |        |
|--------|----|--------|--------|--------|
|        | Q3 | $10.2  | $4.4   | $14.6  |
|        | Q4 | $8.6   | $30.4  | $39.0  |
| 2014   | Q1 | $7.2   | $10.4  | $17.6  |
|        | Q2 | $5.7   | $4.5   | $10.2  |
|        | Q3 | $3.7   | $1.9   | $5.6   |
|        | Q4 | $4.0   | $2.8   | $6.8   |
| 2015   | Q1 | $1.9   | $0.9   | $2.8   |
|        | Q2 | $1.8   | $0.7   | $2.5   |
|        | Q3 | $4.4   | $3.9   | $8.3   |
|        | Q4 | $2.2   | $0.0   | $2.2   |
| 2016   | Q1 | $2.9   | $1.7   | $4.6   |
|        | Q2 | $0.9   | $0.0   | $0.9   |
|        | Q3 | $2.9   | $0.9   | $3.8   |
|        | Q4 | $3.0   | $2.3   | $5.3   |
| 2017   | Q1 | $5.5   | $4.5   | $10.0  |
|        | Q2 | $2.8   | $2.2   | $5.0   |
|        | Q3 | $3.1   | $2.0   | $5.1   |
|        | Q4 | $0.7   | $2.3   | $3.0   |
| 2018   | Q1 | $0.0   | $0.0   | $0.0   |
| Total  |    | $135.1 | $88.6  | $223.7 |

101.    As the above chart shows, the Companies have paid Treasury $223.7 billion in "dividends" under the Net Worth Sweep.  Had they instead been paying 10% cash dividends, they would have paid Treasury $99.5 billion by the end of the first quarter of 2018, and would have saved even more had the Companies been allowed to use the excess funds to pay down the principal on Treasury's commitment.  The government has thus profited from the Net Worth Sweep by at least $124 billion.

102.    The chart above also shows that the Companies' dividend obligations in the fourth quarter of 2017 and first quarter of 2018 totaled $3.0 billion.  But this is not in any way a sign

that the Companies are in distress or that they are no longer positioned to generate large profits.

In the third quarter of 2017, the Companies generated $7.7 billion of comprehensive income, and

under the Net Worth Sweep that total was the dividend due in the fourth quarter.  Before that

dividend was paid, however, Treasury and FHFA agreed that the Companies could each retain

$2.4 billion, and, as noted above, that moving forward the capital buffer under the sweep would

be $3 billion, rather than decreasing to $0 in 2018.  This "Fourth Amendment" does not affect

the substance of Plaintiff's claims in this litigation.  Indeed, FHFA and Treasury specified that

the liquidation preference of Treasury's stock in each company would be increased by $3.0

billion, making clear that the capital buffer ultimately would benefit Treasury, not private

shareholders.

103.    In the fourth quarter of 2017, Fannie and Freddie were required to write down the

value of their deferred tax assets to account for the recent decrease in the corporate income tax

rate.  This write-down decreased their comprehensive income for the quarter by $15.3 billion.

Thus, instead of reporting comprehensive income of $5.3 billion, the Companies reported a

comprehensive loss of $10 billion, and they announced that they will be requesting a $4 billion

draw from Treasury's commitment.  This one-time event does not change the Companies'

underlying profitability and, in fact, moving forward the decrease in the tax rate enhances the

Companies' outlook.  Moreover, this event would not have required a draw from Treasury at all

had the Companies been allowed to retain the billions in excess "dividend" payments made

under the Net Worth Sweep.

104.    Another way to gauge the financial impact of the Net Worth Sweep is to compare

it to what would have happened had the Companies instead been allowed to use their quarterly

profits above Treasury's 10% dividend to partially retire Treasury's senior preferred stock.  In

that alternative scenario, Treasury's remaining investment in Freddie would have been fully

redeemed in 2017.  Indeed, Freddie has paid Treasury $6.3 billion *more* than the amount needed

to redeem the Government Stock completely.  Similarly, had Fannie been allowed to use its

profits in excess of Treasury's original 10% dividend to partially redeem the Government Stock,

the remaining liquidation preference on that stock would today stand at only $2.1 billion.

Furthermore, given the Companies' strong financial condition when the Net Worth Sweep was

announced and the very low interest rates that prevailed at the time, the Companies could have

used debt and equity markets to obtain additional capital at a rate far lower than the 10% cash or

12% in kind rate mandated by the original terms of the Government Stock.

106.    The Net Worth Sweep has become a major revenue source for the United States

government.  Indeed, the federal government's record-breaking $53.2 billion surplus for the

month of December 2013 was driven in large part by the $39 billion swept from Fannie and

Freddie.

106.    These massive influxes of cash began to arrive just when the government was

confronting the statutory debt ceiling and accompanying political deadlock.  *See* Jody Shenn &

Ian Katz, *Fannie Mae Profit May Swell Treasury Coffers as Debt Limit Looms*, Bloomberg (Apr.

8, 2013), http://www.bloomberg.com/news/articles/2013-04-08/fannie-mae-profit-may-swell-

treasury-coffers-at-debt-limit-looMs.  And because they were characterized as "dividends," and

not a redemption of Treasury's Stock, the Pay It Back Act allowed the cash to be used for the

government's general operating expenses rather than only for debt reduction.  *See* 12 U.S.C.

§ 1719(g)(2); 12 U.S.C. § 1455(*l*)(2); 12 U.S.C. § 1455 note.

107.    All told, Fannie has requested $119.8 billion in draws from Treasury under the

PSPAs, and Treasury has recouped a total of $166.4 billion from Fannie in the form of purported

"dividends." Freddie has requested $71.6 in draws from Treasury under the PSPAs, and Treasury has recouped a total of $112.4 billion from Freddie in the form of purported "dividends." Combined, Fannie and Freddie have paid Treasury approximately $87 billion more than they have received.

108.    As explained above, when entering the Net Worth Sweep FHFA and Treasury knew that the Companies were poised to generate earnings well in excess of 10% dividend payments, and they therefore knew that the Net Worth Sweep would be profitable for the federal government. It is thus not surprising that a document prepared for internal Treasury consumption and dated August 16, 2012 listed the Companies' "improving operating performance" and the "potential for near-term earnings to exceed the 10% dividend" as reasons for "putting in place a better deal for taxpayers" by promptly adopting the Net Worth Sweep. Another Treasury document emphasized that the Net Worth Sweep would put the taxpayer "in a better position" because rather than having "Treasury's upside . . . capped at the 10% dividend, now the taxpayer will be the beneficiary of any future earnings produced by the GSEs." Additional Treasury communications indicate that the Agency anticipated that Treasury's receipts under the Net Worth Sweep "will likely exceed the amount that would have been paid if the 10% was still in effect" and that the Net Worth Sweep would lead to "a better outcome" for Treasury.

**4.      The Net Worth Sweep guarantees that Fannie and Freddie can never be rehabilitated to a sound and solvent condition, and it positions them to be wound down and eliminated.**

109.    The Net Worth Sweep makes the Companies unique in financial regulation. All other financial institutions are required to retain minimum levels of capital that ensure that they can withstand the vicissitudes of the economic cycle and are prohibited from paying dividends when they are not adequately capitalized. The FDIC's Risk Management Manual of

Examination Policies explains why capital is critical to any financial institution:  "It absorbs

losses, promotes public confidence, helps restrict excessive asset growth, and provides protection

to [market participants]."  For this reason, in all other contexts financial regulators work to

ensure that financial institutions maintain minimum capital levels.

110.    The Companies, in contrast, are not allowed to retain capital but instead must pay

nearly their entire net worth over to Treasury as a quarterly dividend.  In other words, whereas

other financial institutions are subject to *minimum* capital standards, the Net Worth Sweep makes

the Companies subject to a capital *maximum—any* amount of retained capital that they hold in

excess of a small capital buffer is swept to Treasury on a quarterly basis.  The effect of the Net

Worth Sweep is thus to force the Companies to operate in perpetuity on the brink of insolvency

and to prohibit them from operating in a safe and sound manner.  Indeed, HERA itself recognizes

the importance of adequate capital—a fundamental aspect of the Companies' soundness is the

"maintenance of adequate capital."  12 U.S.C. § 4513(a)(1)(B)(i).  Director Watt has expressed

the same view, describing the Companies' inability to build capital reserves under the Net Worth

Sweep as a "serious risk" that erodes investor confidence in the Companies because they have

"no ability to weather quarterly losses."  Indeed, the fact that the Companies were required to

take a draw because of a tax cut demonstrates the perversity of the government's decision to strip

the Companies of their capital.

111.    The timing of the Net Worth Sweep was driven by the Companies' return to

profitability.  Notwithstanding the Agencies' statutory duties, the Administration had decided

that Fannie and Freddie would be wound down and would *not* be allowed to exit conservatorship

in their current form.  Allowing Fannie and Freddie to rebuild their capital levels, however,

would make that political decision more difficult to explain and sustain.  The *Economist* stated

the obvious in reporting that the Net Worth Sweep "squashe[d] hopes that [Fannie and Freddie] may ever be private again." *Back to Black,* THE ECONOMIST (Aug. 25, 2012), http:goo.g1/1PHMs.

112.    Treasury openly proclaimed that the Net Worth Sweep would "expedite the wind down of Fannie Mae and Freddie Mac."  Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012), https://goo.gl/NDAKhQ.  Indeed, Treasury emphasized that the Net Worth Sweep would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id.*

113.    FHFA Acting Director Edward DeMarco similarly informed a Senate Committee that the "recent changes to the [PSPAs], replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status."  Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking, Housing & Urban Affairs (Apr. 18, 2013), https://goo.gl/oxdMc6.  And in a 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac."  FHFA, REPORT TO CONGRESS:  2012 at 13 (June 13, 2013), https://goo.gl/ocyB9J.  The Net Worth Sweep thus "reinforces the fact that the [Companies] will not be building capital." *Id.* at 1, 13.

114.    As a result of the Net Worth Sweep, it is clear that FHFA—contrary to any precedent from the common law or the FDIC—will not allow Fannie and Freddie to exit conservatorship but rather will continue to operate them essentially as wards of the state and loot their profits, unless and until Congress takes action.  Indeed, FHFA's website states that "FHFA

will continue to carry out its responsibilities as Conservator" until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." *FHFA as Conservator of Fannie Mae and Freddie Mac*, FHFA, http://goo.gl/PjyPZb.  This is consistent with the testimony of former Acting Director DeMarco, who stated that he had no intention of returning Fannie and Freddie to private control under charters he perceived to be "flawed."  Mr. Ugoletti also testified that FHFA's objective "was not for Fannie and Freddie Mac to emerge from conservatorship."

115.    This understanding of the purpose of the Net Worth Sweep is further supported by the testimony of Ms. McFarland, Fannie's CFO at the time.  She believed that the Agencies imposed the Net Worth Sweep in response to what she told Treasury on August 9, and she thought its purpose "was probably a desire not to allow capital to build up within the enterprises and not to allow the enterprises to recapitalize themselves."  According to Ms. McFarland, Fannie "didn't believe that Treasury would be too fond of a significant amount of capital buildup inside the enterprises."

116.    Communications involving White House official Jim Parrott provide further proof that the Net Worth Sweep was intended to advance the policy objectives discussed above.  At the time of the Net Worth Sweep, Mr. Parrott was a senior advisor at the National Economic Council, where he led a team of advisors charged with counseling President Obama and the cabinet on housing issues.  He worked closely with Treasury in the development and rollout of the Net Worth Sweep.  Indeed, the day after the Net Worth Sweep was announced, he emailed Treasury officials congratulating them on achieving an important policy goal:  "Team Tsy, You guys did a remarkable job on the PSPAs this week.  You delivered on a policy change of enormous importance that's actually being recognized as such by the outside world . . . , and as a

credit to the Secretary and the President.  It was a very high risk exercise, which could have gone sideways on us any number of ways, but it didn't."  What Treasury had accomplished, Mr. Parrott's emails make clear, was maximizing Treasury's profits and guaranteeing that Fannie and Freddie would be unable to rebuild capital and escape conservatorship, contrary to any known example of a conservator at common law or run by the FDIC:

- In an August 13, 2012 email justifying the forthcoming Net Worth Sweep to skeptical observers, Parrott wrote that "[w]e are making sure that each of these entities pays the taxpayer back every dollar of profit that they make, not just a 10% dividend," and that "[t]he taxpayer will thus ultimately collect more money with the changes."

- In an email to a Treasury official on the day the Net Worth Sweep was announced, Mr. Parrott stated that "we've closed off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again."

- That same day, Mr. Parrott received an email from a market analyst stating that the Net Worth Sweep "should lay to rest permanently the idea that the outstanding privately held pref[ferred stock] will ever get turned back on." He forwarded the email to Treasury officials and commented that "all the investors will get this very quickly."

- At 8:30 a.m. on August 17, Mr. Parrott wrote an email to Alex Pollock, Peter Wallison, and Edward Pinto offering "to walk you through the changes we're announcing on the pspas today.  Feel like fellow travelers at this point so I owe it to you."  Pollock, Wallison, and Pinto had written a policy paper for the American Enterprise Institute in 2011 recommending that "Fannie Mae and

Freddie Mac should be eliminated as government-sponsored enterprises (GSEs) over time."

- Also on August 17, Mr. Wallison was quoted in Bloomberg saying the following:  "The most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't happen."  In an email to Wallison that evening, Mr. Parrott stated, "Good comment in Bloomberg—**you are exactly right on substance and intent.**"

- In another email to Wallison that evening, Mr. Parrott wrote that, "[d]ividend is variable, set at whatever profit for quarter is, eliminating ability to pay down principal (so they can't repay their debt and escape as it were)."

- Mr. Parrott also wrote on August 17 that, "we're not reducing their dividend but including in it every dime these guys make going forward and ensuring they can't recapitalize."

117.    Mr. Parrott, who has left the White House and is now with the Urban Institute, told the *Economist* that "[i]n the aftermath of the crisis there was widespread agreement that [Fannie and Freddie] needed to be replaced or overhauled."  *A Funny Form of Conservation*, THE ECONOMIST (Nov. 21, 2015), http:goo.gl/gJVJrN.  The Net Worth Sweep ensured that the Companies' return to profitability did not threaten this goal.

118.    In short, the government's Net Worth Sweep is designed to raise general revenue and further the policy goals of the Agencies at the expense of the Companies and their shareholders.

**G.     The Net Worth Sweep Was Not Justified By Any Exigency**

119.    The government has advanced an alternative explanation for the Net Worth Sweep—that it was intended to stave off the risk of a "death spiral" caused by drawing from Treasury's commitment to pay Treasury's dividends.  But this "death spiral" explanation is belied by the following facts, in addition to those discussed above regarding the Net Worth Sweep's true purposes.

120.    **First**, given Fannie's and Freddie's return to profitability, there was no imminent risk that the Companies would be depleting Treasury's funding commitment—that risk was at its lowest point since the start of the conservatorships.  Indeed, a memo prepared by Treasury staff indicates that on June 25, 2012, FHFA Acting Director DeMarco informed Treasury Secretary Geithner and Under Secretary Miller that he saw no "urgency of amending the PSPAs this year" because Fannie and Freddie "will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future."  Communications within both FHFA and Treasury in the months leading up to the Net Worth Sweep indicate that the Companies' bond investors regarded Treasury's funding commitment as sufficient.  And in comments on a Q&A document explaining the Net Worth Sweep, a Treasury official observed that an explanation that the Net Worth Sweep was needed because "the 10 percent dividend was likely to be unstable" was one that "[d]oesn't hold water."

121.    **Second**, as explained above, the original terms of the PSPAs entitled the Companies to pay Treasury's dividends in kind with additional stock, thus avoiding the need to make draws on Treasury's funding commitment to finance cash dividends they could not

otherwise afford.  Furthermore, an internal Treasury memorandum from 2011 acknowledged that any threat to Treasury's funding commitment from dividend payments potentially could be addressed by "converting [Treasury's] preferred stock into common or cutting or deferring payment of the dividend (under legal review)."  Memorandum from Jeffery A. Goldstein, Undersecretary, Domestic Finance, to Timothy Geithner, Secretary, United States Treasury, 3 (Jan. 4, 2011).  In other words, the problem the government was purportedly trying to solve with the Net Worth Sweep, a cash dividend too high to be serviced by earnings, could be addressed by other means already known to Treasury, such as cutting or deferring payment of the dividend.  Of course, given the payment-in-kind option, the purported problem was wholly illusory.  An internal Treasury document explicitly recognized this point:  "To the extent that required dividend payments exceed net income, FHFA, as conservator, could consider not declaring dividends pursuant to the certificates of designation for the preferred shares, so that draws on the PSPAs are not used to pay dividends, preserving as much funding as possible to cover any unanticipated losses at Fannie Mae and Freddie Mac."

122.    **Third**, the Agencies actually considered an alternative to the arrangement they ultimately adopted that would have had the Net Worth Sweep only kick in if Treasury's remaining funding commitment fell below $100 billion.  The only plausible explanation for the Agencies' decision not to embrace that alternative is that they knew it would allow the Companies to rebuild capital in contravention of the Obama Administration's commitment to wipe out private shareholders and prevent the Companies from exiting conservatorship.

123.    **Fourth**, the structure and timing of the Net Worth Sweep—coming when the Companies were about to add tens of billions of dollars to their balance sheets—had the effect of *reducing* the amount of money available to guarantee that the Companies would maintain a

positive net worth.  If the Agencies were genuinely concerned about reassuring the Companies'

bond investors that they would be repaid, the Agencies would have delayed imposing the Net

Worth Sweep so long as the Companies maintained a substantial positive net worth.  Instead,

they adopted the Net Worth Sweep at a time when they knew that its near-term effect would be

to transfer to Treasury massive profits that the Companies could have otherwise retained as a

capital buffer and used to avoid making draws on Treasury's funding commitment in any

subsequent unprofitable quarters.  Indeed, FHFA has acknowledged how the Net Worth Sweep

increases the chances of further draws on Treasury's funding commitment, observing that the

Companies "are constrained by the PSPAs from building capital" and that the lack of retained

capital combined with "mark-to-market volatility from the [Companies'] derivatives portfolio"

has the effect of increasing "the likelihood of negative net worth in future quarters."  Thus, even

if the Agencies believed that the Companies could not generate enough profits in the long term to

finance a 10% dividend on Treasury's investment, they would not have imposed the Net Worth

Sweep when they did if their goal was to preserve Treasury's funding commitment.  Doing so

only increased the likelihood of future draws.  Accordingly, the Net Worth Sweep has not

ensured continued access to capital for the Companies or preserved their financial stability and

solvency.

124.    **Fifth**, the Net Worth Sweep, announced on the heels of Fannie and Freddie

announcing earnings allowing them to begin rebuilding capital, was adopted when it was not

because the Companies would be earning too little, but rather because they would be earning too

much.  Under these circumstances, the FDIC would have looked to return the entity to the private

market.  But the Agencies took a different path in light of their policy goals of keeping Fannie

and Freddie under government control and prohibiting their private shareholders from realizing

any value from their investments.  An internal Treasury document prepared on July 30, 2012, stated that the Net Worth Sweep should be announced shortly after August 7, when Treasury anticipated the Companies would "report very strong earnings . . . that will be in excess of the 10% dividend."  On August 1, a Treasury official similarly emphasized that the Net Worth Sweep should be announced in mid-August because the Companies' "[e]arnings will be in excess of current 10% dividend."  FHFA's Mr. Ugoletti reported a "renewed push" from Treasury to implement the Net Worth Sweep on August 9, 2012—the same day that Fannie's CFO told Treasury that it was likely that her company would soon be in a position to make an accounting decision that would add tens of billions of dollars to its earnings.  And on August 17, 2012, Mr. Ugoletti wrote to Mr. DeMarco and other FIFA officials that "other than a transitory buffer," the Net Worth Sweep "does not allow the Enterprises to build up a retained surplus, which may give the impression that they are healthy institutions."

125.    That the Net Worth Sweep was not intended to advance any legitimate interest of FHFA as conservator is further demonstrated by the fact Treasury was the driving force behind the initiative.  Indeed, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury.  The Net Worth Sweep was a Treasury initiative and reflected the culmination of Treasury's long-term plan to seize the Companies and see that they were operated for the exclusive benefit of the federal government.  Indeed, Mr. Parrott has testified that the Net Worth Sweep was imposed through a "Treasury-driven process."  It was Treasury that informed the Companies just days before the Net Worth Sweep that it was forthcoming, and a meeting addressing the Net Worth Sweep was held at Treasury during which a senior Treasury official announced the changes.  Secretary Geithner apparently believed that even before the Net Worth Sweep was imposed, "we had already effectively nationalized the

GSEs . . . , and could decide how to carve up, dismember, sell or restructure those institutions." Plaintiff's Corrected Post-Trial Proposed Findings of Fact 26.2.1(a), *Starr Int'l Co. v. United States*, No. 1:11-cv-779-TCW (Fed. Cl. Mar. 2, 2015), ECF No. 430. FHFA simply acquiesced to Treasury's demands regarding the Net Worth Sweep. On information and belief, there is no written record suggesting that FHFA ever advocated an alternative that would have been more favorable to the Companies or their shareholders. On information and belief, nor is there any evidence that FHFA attempted to calculate the Companies' net worth before agreeing to transfer it to Treasury through the Net Worth Sweep.

126. The Net Worth Sweep is just one example of the significant influence Treasury has exerted over FHFA from the beginning of the conservatorship. Secretary Paulson has written that "seizing control" of Fannie and Freddie, an action that is statutorily reserved to FHFA, was an action "I took." HENRY M. PAULSON, JR., ON THE BRINK xiv (2010). Secretary Geithner, who was president of the Federal Reserve Bank of New York at the time, understood the federal takeover of Fannie and Freddie to be a "Treasury operation," and then-Chairman of the Federal Reserve Ben Bernanke has said that "Treasury took over Fannie and Freddie." Similarly, Congressional Budget Office Assistant Director for Financial Analysis Deborah Lucas told Congress that the Companies are subject to "ownership and control by the Treasury." *Fannie Mae, Freddie Mac & FHA: Taxpayer Exposure in the Housing Markets: Hearing Before the H. Comm. on the Budget*, 112th Cong. 15 (2011). When asked whether Fannie had ever considered paying Treasury's dividends in-kind, rather than a cash dividend, Ms. McFarland testified that "in my mind, what form of payment we would make and what we were able to do was what Treasury would allow us to do." In its SEC filings, Freddie has said

that it and Treasury are "related parties," as defined by Statement of Financial Accounting Standards 57.

127.    The Net Worth Sweep was merely one element of a broader Treasury plan to transform the housing finance market and to eliminate Fannie and Freddie.  Indeed, a housing finance reform plan drafted by Treasury in early 2012 listed "restructur[ing] the PSPAs to allow for variable dividend payment based on positive net worth"—i.e., implementing a net worth sweep—as among the first steps to take in transitioning to Treasury's desired outcome.  Other elements of that plan included the development of a single securitization utility to be used by both Fannie and Freddie—and by other entities once Fannie and Freddie are eliminated.  FHFA has made the development of such a utility a key initiative of the conservatorships, providing further evidence that FHFA is operating according to Treasury's playbook, and improperly abdicating its conservatorship responsibilities.

**H.    Derivative and Demand Futility Allegations**

128.    Perry Capital bring Counts II, V, VIII, and XI of this action derivatively on behalf of and for the benefit of Fannie to redress injuries suffered by Fannie as a direct and proximate result of the wrongdoing alleged herein.  Fannie is named as a nominal defendant in a derivative capacity.

129.    Perry Capital is a holder of Fannie Preferred Stock and Common Stock.  Perry Capital was a holder of Fannie Common Stock prior to and on August 17, 2012, and has been a holder of said securities continuously since then.  Perry Capital also has held series of Fannie Preferred Stock prior to and on August 17, 2012, and has held series of Preferred Stock continuously since then.

130.    Perry Capital brings Counts III, VI, IX, and XII of this action derivatively on behalf of and for the benefit of Freddie to redress injuries suffered by Freddie as a direct and

proximate result of the wrongdoing alleged herein.  Freddie is named as a nominal defendant in a derivative capacity.

131.    Perry Capital is a holder of Freddie Preferred Stock and Common Stock.  Perry Capital was a holder of Freddie Common Stock prior to and on August 17, 2012, and has been a holder of said securities continuously since then.  Perry Capital also has held series of Freddie Preferred Stock prior to and on August 17, 2012, and has held series of Preferred Stock continuously since then.

132.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

133.    Perry Capital will adequately and fairly represent the interests of the Companies and their stockholders in enforcing and prosecuting their rights.

134.    Perry Capital has retained competent and experienced counsel.

135.    The wrongdoing and violations of law complained of herein subject, and will persist in subjecting, the Companies to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

136.    Perry Capital has not made a demand on FHFA or on the Boards of Fannie and Freddie because doing so would be futile.  As conservator, FHFA has succeeded to the powers of the Companies' Boards.  *See* 12 U.S.C. § 4617(b)(2)(A).  FHFA, of course, is along with Treasury responsible for the adoption of the Net Worth Sweep agreement being challenged in this litigation, and the Net Worth Sweep was adopted to benefit the federal government and to advance FHFA's and Treasury's policy objectives as agencies of the federal government.  FHFA therefore has a manifest conflict of interest, and it cannot reasonably be expected to initiate (or authorize the Companies to initiate) litigation challenging the Net Worth Sweep.  Indeed, FHFA

has steadfastly defended the Net Worth Sweep in the courts, and it has rebuffed other shareholders who have demanded that it or Freddie's Board commence litigation challenging the Net Worth Sweep.  Furthermore, as an agency of the federal government that acted as a governmental entity when it approved the Net Worth Sweep, FHFA would not have standing to sue the United States.  Accordingly, FHFA is incapable of pursuing the derivative claims for the wrongdoing alleged herein.

## COUNT I

### Just Compensation Under the Fifth Amendment
### for the Taking of Private Property for Public Use

### (Direct Claim)

137.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

138.    The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

139.    In the August 2012 Net Worth Sweep amendment to the Purchase Agreements, the government entered into an agreement with itself to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  One federal agency—FHFA, supposedly acting as conservator for the Companies—struck a deal with a second federal agency—Treasury—to effectively confiscate the Preferred Stock and Common Stock held by Plaintiff and other private investors in Fannie and Freddie.

140.    At the outset of conservatorship, FHFA's Director confirmed that the preferred shareholders of Fannie and Freddie retained an economic interest in the Companies.  As equity shareholders, that economic interest took the form of a claim on the Companies' equity that

could be paid out in the form of dividends or a liquidation payment.  Plaintiff had both a property interest and a reasonable, investment-backed expectation in the economic interest in the Companies they held due to their ownership of Preferred Stock and Common Stock.  The Net Worth Sweep expropriated this economic interest by assigning the right to all of Fannie's and Freddie's equity to Treasury.

141.    Treasury was the driving force behind the Net Worth Sweep, and both FHFA and Treasury entered the Net Worth Sweep to advance the interests of the government.  The policy interests the Agencies sought to advance through the Net Worth Sweep included:  prohibiting Fannie and Freddie from recapitalizing and positioning themselves to exit conservatorship; ensuring that Fannie and Freddie would be wound down and, eventually, eliminated; enriching the government; and expropriating the economic interests of Fannie's and Freddie's common and preferred shareholders.

142.    Plaintiff—who holds Preferred Stock—had both a property interest and a reasonable, investment-backed expectation in its Preferred Stock and in the share of the Companies' future earnings to which Plaintiff and other holders of Preferred Stock were contractually entitled.  Plaintiff also had both a property interest and a reasonable, investment-backed expectation in the liquidation preference to which such Preferred Stock was contractually entitled in the event that Fannie and Freddie were dissolved or liquidated.

143.    Plaintiff—who holds Common Stock—had both a property interest and a reasonable, investment-backed expectation in its Common Stock and in the share of the Companies' future earnings to which it and other holders of Common Stock were entitled. Such Plaintiff had both a property interest and a reasonable, investment-backed expectation in the liquidation rights to which such Common Stock was entitled in the event that Fannie and Freddie

were dissolved or liquidated.  In addition, owners of the Companies' Common Stock had a property interest in and a reasonable investment backed expectation based upon their voting rights as shareholders—rights that the Agencies took by entering into the Net Worth Sweep, which forces the Companies to remain in permanent conservatorship by preventing them from rebuilding capital.

144.    The government, by operation of the Net Worth Sweep, has expropriated Plaintiff's property interest in its Preferred Stock and Common Stock and has destroyed Plaintiff's reasonable, investment-backed expectations without paying just compensation.

145.    As a result of the Net Worth Sweep, Plaintiff has been deprived of all economically beneficial uses of its Preferred Stock and Common Stock in Fannie and Freddie. Plaintiff is entitled to just compensation for the government's taking of their property.

## COUNT II

### Just Compensation Under the Fifth Amendment
### for the Taking of Private Property for Public Use

**(Derivative Claim on Behalf of Fannie Mae)**

146.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

147.    The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

148.    In the August 2012 Net Worth Sweep amendment to the Purchase Agreements, the government entered into an agreement with itself to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  One federal agency—FHFA, supposedly acting as

conservator for the Companies—struck a deal with a second federal agency—Treasury—to confiscate Fannie's net worth.

149.    Treasury was the driving force behind the Net Worth Sweep, and both FHFA and Treasury entered the Net Worth Sweep to advance the interests of the government.  The policy interests the Agencies sought to advance through the Net Worth Sweep included:  prohibiting Fannie and Freddie from recapitalizing and positioning themselves to exit conservatorship; ensuring that Fannie and Freddie would be wound down and, eventually, eliminated; enriching the government; and expropriating the economic interests of Fannie's and Freddie's common and preferred shareholders.

150.    Fannie had both a property interest and a reasonable, investment-backed expectation in its net worth.

151.    The government, by operation of the Net Worth Sweep, has expropriated Fannie's property interest in its net worth and has destroyed Fannie's reasonable, investment-backed expectations without paying just compensation.

152.    As a result of the Net Worth Sweep, Fannie has been deprived of all economically beneficial uses of the net worth swept to the government.

153.    Fannie is entitled to just compensation for the government's taking of its property.

154.    FHFA has a manifest conflict of interest with respect to the Net Worth Sweep. FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the government, and it has steadfastly defended it in court.

## COUNT III

### Just Compensation Under the Fifth Amendment
### for the Taking of Private Property for Public Use

### (Derivative Claim on Behalf of Freddie Mac)

155.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

156.    The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

157.    In the August 2012 Net Worth Sweep amendment to the Purchase Agreements, the government entered into an agreement with itself to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  One federal agency—FHFA, supposedly acting as conservator for the Companies—struck a deal with a second federal agency—Treasury—to confiscate Freddie's net worth.

158.    Treasury was the driving force behind the Net Worth Sweep, and both FHFA and Treasury entered the Net Worth Sweep to advance the interests of the government.  The policy interests the Agencies sought to advance through the Net Worth Sweep included:  prohibiting Fannie and Freddie from recapitalizing and positioning themselves to exit conservatorship; ensuring that Fannie and Freddie would be wound down and, eventually, eliminated; enriching the government; and expropriating the economic interests of Fannie's and Freddie's common and preferred shareholders.

159.    Freddie had both a property interest and a reasonable, investment-backed expectation in its net worth.

160.    The government, by operation of the Net Worth Sweep, has expropriated Freddie's property interest in its net worth and has destroyed Freddie's reasonable, investment-backed expectations without paying just compensation.

161.    As a result of the Net Worth Sweep, Freddie has been deprived of all economically beneficial uses of the net worth swept to the government.

162.    Freddie is entitled to just compensation for the government's taking of its property.

163.    FHFA has a manifest conflict of interest with respect to the Net Worth Sweep. FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the government, and it has steadfastly defended it in court.

## COUNT IV

## Illegal Exaction Under the Fifth Amendment

### (Alternative Direct Claim)

164.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

165.    In the August 2012 Net Worth Sweep amendment to the Purchase Agreements, the government entered into an agreement with itself to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  One federal agency—FHFA, supposedly acting as conservator for the Companies—struck a deal with a second federal agency—Treasury—to effectively confiscate the Preferred Stock and Common Stock held by Plaintiff and other private investors in Fannie and Freddie.

166.    At the outset of conservatorship, FHFA's Director confirmed that both the preferred and common shareholders of Fannie and Freddie retained an economic interest in the Companies.  As equity shareholders, that economic interest took the form of a claim on the

Companies' equity that could be paid out in the form of dividends or a liquidation payment. Plaintiff had both a property interest and a reasonable, investment-backed expectation in the economic interest in the Companies it held due to its ownership of Preferred Stock and Common Stock. The Net Worth Sweep expropriated this economic interest by assigning the right to all of Fannie's and Freddie's equity to Treasury.

167.    Treasury was the driving force behind the Net Worth Sweep, and both FHFA and Treasury entered the Net Worth Sweep to advance the interests of the government. The policy interests the Agencies sought to advance through the Net Worth Sweep included:  prohibiting Fannie and Freddie from recapitalizing and positioning themselves to exit conservatorship; ensuring that Fannie and Freddie would be wound down and, eventually, eliminated; enriching the government; and expropriating the economic interests of Fannie's and Freddie's common and preferred shareholders.

168.    In agreeing to the Net Worth Sweep, FHFA purportedly acted pursuant to its authority as conservator of Fannie and Freddie under 12 U.S.C. § 4617, and Treasury purportedly acted pursuant to authority granted to it under 12 U.S.C. §§ 1455 and 1719.  These statutes, however, did not authorize either FHFA or Treasury to expropriate Plaintiff's economic interest in Fannie and Freddie for the benefit of the government.

169.    In addition, FHFA acted unlawfully because it is an unconstitutional "independent" agency whose Director was removeable only for cause in violation of the Appointments Clause.

170.    The Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully

executed," U.S. Const. art. II, § 3. Those provisions vest all executive power in the President of the United States.

171.    By making FHFA's head a single Director rather than a multi-member Board and eliminating the President's power to remove the Director at will, HERA violates the Constitution's separation of powers. An independent agency headed by a single Director is virtually unprecedented in our Nation's history, and this structure impermissibly concentrates power in a single person who is not the President.

172.    Neither Congress nor the President can negate the constitution's structural requirements by signing or enacting (and thereby acceding to) HERA. "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court has noted, "[b]ut the separation of powers does not depend on the views of individual Presidents"—or particular Congresses. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010). The Constitution's separation of powers does not depend "on whether 'the encroached-upon branch approves the encroachment.'" *Id.* (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

173.    "The diffusion of power" away from Congress and the President, to the independent FHFA, "carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." *Id.* (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton)).

174.    FHFA and Treasury therefore have illegally exacted Plaintiff's economic interest in Fannie and Freddie without due process.

## COUNT V

### Illegal Exaction Under the Fifth Amendment

### (Alternative Derivative Claim on Behalf of Fannie Mae)

175.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

176.    In the August 2012 Net Worth Sweep amendment to the Purchase Agreements, the government entered into an agreement with itself to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  One federal agency—FHFA, supposedly acting as conservator for the Companies—struck a deal with a second federal agency—Treasury—to confiscate Fannie's Net Worth.

177.    Treasury was the driving force behind the Net Worth Sweep, and both FHFA and Treasury entered the Net Worth Sweep to advance the interests of the government.  The policy interests the Agencies sought to advance through the Net Worth Sweep included:  prohibiting Fannie and Freddie from recapitalizing and positioning themselves to exit conservatorship; that Fannie and Freddie would be wound down and, eventually, eliminated; enriching the government; and expropriating the economic interests of Fannie's and Freddie's preferred and common shareholders.

178.    In agreeing to the Net Worth Sweep, FHFA purportedly acted pursuant to its authority as conservator of Fannie and Freddie under 12 U.S.C. § 4617, and Treasury purportedly acted pursuant to authority granted to it under 12 U.S.C. §§ 1455 and 1719.  These statutes, however, did not authorize either FHFA or Treasury to expropriate Fannie's net worth for the benefit of the government.

179.    In addition, FHFA acted unlawfully because it is an unconstitutional "independent" agency whose Director was removeable only for cause in violation of the Appointments Clause.

180.    The Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. Those provisions vest all executive power in the President of the United States.

181.    By making FHFA's head a single Director rather than a multi-member Board and eliminating the President's power to remove the Director at will, HERA violates the Constitution's separation of powers. An independent agency headed by a single Director is virtually unprecedented in our Nation's history, and this structure impermissibly concentrates power in a single person who is not the President.

182.    Neither Congress nor the President can negate the constitution's structural requirements by signing or enacting (and thereby acceding to) HERA. "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court has noted, "[b]ut the separation of powers does not depend on the views of individual Presidents"—or particular Congresses. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010). The Constitution's separation of powers does not depend "on whether 'the encroached-upon branch approves the encroachment.'" *Id.* (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

183.    "The diffusion of power" away from Congress and the President, to the independent FHFA, "carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment

of a pernicious measure, or series of pernicious measures ought really to fall." Id. (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton)).

184.    FHFA and Treasury therefore have illegally exacted Fannie's net worth without due process.

185.    FHFA has a manifest conflict of interest with respect to the Net Worth Sweep. FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the government, and it has steadfastly defended it in court.

## COUNT VI

## Illegal Exaction Under the Fifth Amendment

### (Alternative Derivative Claim on Behalf of Freddie Mac)

186.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

187.    In the August 2012 Net Worth Sweep amendment to the Purchase Agreements, the government entered into an agreement with itself to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  One federal agency—FHFA, supposedly acting as conservator for the Companies—struck a deal with a second federal agency—Treasury—to confiscate Freddie's Net Worth.

188.    Treasury was the driving force behind the Net Worth Sweep, and both FHFA and Treasury entered the Net Worth Sweep to advance the interests of the government.  The policy interests the Agencies sought to advance through the Net Worth Sweep included:  prohibiting Fannie and Freddie from recapitalizing and positioning themselves to exit conservatorship; ensuring that Fannie and Freddie would be wound down and, eventually, eliminated; enriching the government; and expropriating the economic interests of Fannie's and Freddie's preferred and common shareholders.

189.    In agreeing to the Net Worth Sweep, FHFA purportedly acted pursuant to its authority as conservator of Fannie and Freddie under 12 U.S.C. § 4617, and Treasury purportedly acted pursuant to authority granted to it under 12 U.S.C. §§ 1455 and 1719.  These statutes, however, did not authorize either FHFA or Treasury to expropriate Freddie's net worth for the benefit of the government.

190.    In addition, FHFA acted unlawfully because it is an unconstitutional "independent" agency whose Director was removeable only for cause in violation of the Appointments Clause.

191.    The Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. Those provisions vest all executive power in the President of the United States.

192.    By making FHFA's head a single Director rather than a multi-member Board and eliminating the President's power to remove the Director at will, HERA violates the Constitution's separation of powers. An independent agency headed by a single Director is virtually unprecedented in our Nation's history, and this structure impermissibly concentrates power in a single person who is not the President.

193.    Neither Congress nor the President can negate the constitution's structural requirements by signing or enacting (and thereby acceding to) HERA. "Perhaps an individual President"—or Congress—"might find advantages in tying his own hands," the Supreme Court has noted, "[b]ut the separation of powers does not depend on the views of individual Presidents"—or particular Congresses. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3155 (2010). The Constitution's separation of powers does not depend "on

whether 'the encroached-upon branch approves the encroachment.'" *Id.* (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).

194.    "The diffusion of power" away from Congress and the President, to the independent FHFA, "carries with it a diffusion of accountability. . . . Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." Id. (quoting The Federalist No. 70, p. 476 (J. Cooke ed. 1961) (A. Hamilton)).

195.    FHFA and Treasury therefore have illegally exacted Freddie's net worth without due process.

196.    FHFA has a manifest conflict of interest with respect to the Net Worth Sweep. FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the government, and it has steadfastly defended it in court.

## COUNT VII

## Breach of Fiduciary Duty

### (Direct Claim)

197.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

198.    The conservatorship provisions of HERA create a fiduciary relationship between the government, on the one hand, and Fannie, Freddie, and the Companies' shareholders, on the other hand.  *See United States v. Mitchell*, 463 U.S. 206 (1983).  FHFA therefore has a fiduciary responsibility to manage the conservatorships of Fannie and Freddie for the benefit of the Companies and their shareholders.

199.    As conservator, FHFA is given elaborate control over Fannie and Freddie.  As conservator, the Agency is vested with "all rights, titles, powers, and privileges of [Fannie and

Freddie], and of any stockholder, officer, or director of [Fannie and Freddie] with respect to [Fannie and Freddie] and [their] assets." 12 U.S.C. § 4617(b)(2)(A).  As conservator, FHFA accordingly has the authority to "take over the assets of and operate [Fannie and Freddie] with all the powers of the shareholders, the directors, and the officers of [Fannie and Freddie] and conduct all business of [Fannie and Freddie]."  *Id*. § 4617(b)(2)(B).

200.    The term "conservator" has long been understood to denote a position of fiduciary responsibility.  HERA accordingly makes clear that FHFA is to exercise its conservatorship authorities for the benefit of the Companies and their shareholders, and that the overriding purpose of the conservatorship is "rehabilitating" Fannie and Freddie.  12 U.S.C. § 4617(a)(2).  For example, FHFA is authorized to "take such action as may be—(i) necessary to put [Fannie and Freddie] in a sound and solvent condition; and (ii) appropriate to carry on the business of [Fannie and Freddie] and preserve and conserve [their] assets and property."  *Id*. § 4617(b)(2)(D).  And when taking any action involving the disposition of Fannie's and Freddie's assets, FHFA is required to "conduct its operations in a manner which . . . maximizes the net present value return from the sale or disposition of such assets."  *Id*. § 4617(b)(2)(E)(i).

201.    In promulgating regulations implementing its conservator authorities, FHFA has recognized that "[a] conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition."  76 Fed. Reg. 35,724, 35,730.

202.    Given the existence of a fiduciary relationship between FHFA and Fannie, Freddie, and the Companies' shareholders, it naturally follows that the government should be liable in damages for the breach of its fiduciary duties.

203.    The Net Worth Sweep is a self-dealing transaction with a sister agency of the government, and it improperly expropriates the economic interest in Fannie and Freddie held by

holders of the Companies' Common and Preferred Stock for the benefit of the government.

Indeed, in light of FHFA's financial interest in the Net Worth Sweep, FHFA's conduct as

conservator is wholly improper.

204.    The Net Worth Sweep was neither entirely nor intrinsically fair.

205.    The Net Worth Sweep constituted waste, gross and palpable overreaching, and a

gross abuse of discretion.

206.    The Net Worth Sweep did not further any valid business purpose or reasonable

business objective of Fannie and Freddie, did not reflect FHFA's good faith business judgment

of what was in the best interest of Fannie and Freddie, and was unfair to the Companies and their

common and preferred shareholders.

207.    Thus, by entering the Net Worth Sweep, FHFA violated its fiduciary duty to

Plaintiff and the other holders of Preferred Stock.

## COUNT VIII

### Breach of Fiduciary Duty

**(Derivative Claim on Behalf of Fannie Mae)**

208.    Plaintiff incorporates by reference and realleges each allegation set forth above, as

though fully set forth herein.

209.    The conservatorship provisions of HERA create a fiduciary relationship between

the government, on the one hand, and Fannie, Freddie, and the Companies' shareholders, on the

other hand.  *See United States v. Mitchell*, 463 U.S. 206 (1983).  FHFA therefore has a fiduciary

responsibility to manage the conservatorships of Fannie and Freddie for the benefit of the

Companies and their shareholders.

210.    As conservator, FHFA is given elaborate control over Fannie and Freddie.  As

conservator, the Agency is vested with "all rights, titles, powers, and privileges of [Fannie and

Freddie], and of any stockholder, officer, or director of [Fannie and Freddie] with respect to

[Fannie and Freddie] and [their] assets." 12 U.S.C. § 4617(b)(2)(A).  As conservator, FHFA

accordingly has the authority to "take over the assets of and operate [Fannie and Freddie] with all

the powers of the shareholders, the directors, and the officers of [Fannie and Freddie] and

conduct all business of [Fannie and Freddie]."  *Id*. § 4617(b)(2)(B).

211.    The term "conservator" has long been understood to denote a position of fiduciary

responsibility.  HERA accordingly makes clear that FHFA is to exercise its conservatorship

authorities for the benefit of the Companies and their shareholders, and that the overriding

purpose of the conservatorship is "rehabilitating" Fannie and Freddie. 12 U.S.C. § 4617(a)(2).

For example, FHFA is authorized to "take such action as may be—(i) necessary to put [Fannie

and Freddie] in a sound and solvent condition; and (ii) appropriate to carry on the business of

[Fannie and Freddie] and preserve and conserve [their] assets and property."  *Id*.

§ 4617(b)(2)(D).  And when taking any action involving the disposition of Fannie's and

Freddie's assets, FHFA is required to "conduct its operations in a manner which . . . maximizes

the net present value return from the sale or disposition of such assets."  *Id*. § 4617(b)(2)(E)(i).

212.    In promulgating regulations implementing its conservator authorities, FHFA has

recognized that "[a] conservator's goal is to continue the operations of a regulated entity,

rehabilitate it and return it to a safe, sound and solvent condition."  76 Fed. Reg. 35,724, 35,730.

213.    Given the existence of a fiduciary relationship between FHFA and Fannie,

Freddie, and the Companies' shareholders, it naturally follows that the government should be

liable in damages for the breach of its fiduciary duties.

214.    The Net Worth Sweep was a self-dealing transaction with a sister agency of the

government, and it improperly and systematically expropriates Fannie's and Freddie's net worth

for the benefit of the government.  Because the Net Worth Sweep systematically strips Fannie

and Freddie of their capital, the Companies cannot be rehabilitated to a sound and solvent

condition.  Indeed, in light of FHFA's financial interest in the Net Worth Sweep, FHFA's

conduct as conservator is wholly improper.

215.    The Net Worth Sweep was neither entirely nor intrinsically fair.

216.    The Net Worth Sweep constituted waste, gross and palpable overreaching, and a

gross abuse of discretion.

217.    The Net Worth Sweep did not further any valid business purpose or reasonable

business objective of Fannie and Freddie and did not reflect FHFA's good faith business

judgment of what was in the best interest of Fannie and Freddie.

218.    Thus, by entering the Net Worth Sweep, FHFA violated its fiduciary duty to

Fannie.

219.    FHFA has a manifest conflict of interest with respect to the Net Worth Sweep.

FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the

government, and it has steadfastly defended it in court.

## COUNT IX

### Breach of Fiduciary Duty

### (Derivative Claim on Behalf of Freddie Mac)

220.    Plaintiff incorporates by reference and realleges each allegation set forth above, as

though fully set forth herein.

221.    The conservatorship provisions of HERA create a fiduciary relationship between

the government, on the one hand, and Fannie, Freddie, and the Companies' shareholders, on the

other hand.  *See United States v. Mitchell*, 463 U.S. 206 (1983).  FHFA therefore has a fiduciary

responsibility to manage the conservatorships of Fannie and Freddie for the benefit of the Companies and their shareholders.

222.     As conservator, FHFA is given elaborate control over Fannie and Freddie.  As conservator, the Agency is vested with "all rights, titles, powers, and privileges of [Fannie and Freddie], and of any stockholder, officer, or director of [Fannie and Freddie] with respect to [Fannie and Freddie] and [their] assets."  12 U.S.C. § 4617(b)(2)(A).  As conservator, FHFA accordingly has the authority to "take over the assets of and operate [Fannie and Freddie] with all the powers of the shareholders, the directors, and the officers of [Fannie and Freddie] and conduct all business of [Fannie and Freddie]."  *Id*. § 4617(b)(2)(B).

223.     The term "conservator" has long been understood to denote a position of fiduciary responsibility.  HERA accordingly makes clear that FHFA is to exercise its conservatorship authorities for the benefit of the Companies and their shareholders, and that the overriding purpose of the conservatorship is "rehabilitating" Fannie and Freddie.  12 U.S.C. § 4617(a)(2).  For example, FHFA is authorized to "take such action as may be—(i) necessary to put [Fannie and Freddie] in a sound and solvent condition; and (ii) appropriate to carry on the business of [Fannie and Freddie] and preserve and conserve [their] assets and property."  *Id*. § 4617(b)(2)(D).  And when taking any action involving the disposition of Fannie's and Freddie's assets, FHFA is required to "conduct its operations in a manner which . . . maximizes the net present value return from the sale or disposition of such assets."  *Id*. § 4617(b)(2)(E)(i).

224.     In promulgating regulations implementing its conservator authorities, FHFA has recognized that "[a] conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition."  76 Fed. Reg. 35,724, 35,730.

225.   Given the existence of a fiduciary relationship between FHFA and Fannie, Freddie, and the Companies' shareholders, it naturally follows that the government should be liable in damages for the breach of its fiduciary duties.

226.   The Net Worth Sweep was a self-dealing transaction with a sister agency of the government, and it improperly expropriates Fannie's and Freddie's net worth for the benefit of the government.  Because the Net Worth Sweep systematically strips Fannie and Freddie of their capital, the Companies cannot be rehabilitated to a sound and solvent condition.  Indeed, in light of FHFA's financial interest in the Net Worth Sweep, FHFA's conduct as conservator is wholly improper.

227.   The Net Worth Sweep was neither entirely nor intrinsically fair.

228.   The Net Worth Sweep constituted waste, gross and palpable overreaching, and a gross abuse of discretion.

229.   The Net Worth Sweep did not further any valid business purpose or reasonable business objective of Fannie and Freddie and did not reflect FHFA's good faith business judgment of what was in the best interest of Fannie and Freddie.

230.   Thus, by entering the Net Worth Sweep, FHFA violated its fiduciary duty to Freddie.

231.   FHFA has a manifest conflict of interest with respect to the Net Worth Sweep. FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the government, and it has steadfastly defended it in court.

## COUNT X

## Breach of Implied-in-Fact Contract Between the United States and the Companies

### (Direct Claim)

232.     Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

233.     Prior to appointing itself conservator on September 6, 2008, FHFA, along with Treasury, unambiguously offered to place Fannie Mae and Freddie Mac into conservatorship by consent, under § 4617(a)(3)(I), with certain conditions described below, and the boards of directors of the Companies accepted this offer.  The government made no finding of insolvency, undercapitalization, or any other ground to impose conservatorship under § 4617(a)(3)(A)-(H) or (J)-(L).

234.     FHFA with the urging of Treasury, offered, and the boards of Fannie Mae and Freddie Mac accepted, a conservatorship that would aim to "preserve and conserve the [Companies'] assets and property" and restore the Companies to a "sound and solvent condition."  *See* § 4617(b)(2)(D).  The offer was also of a conservatorship that would end when that goal was achieved.  Neither of these conditions was ambiguous.

235.     Underlying the offer was its promise that FHFA would not, as conservator, wind down or liquidate the Companies.  When it publicly announced the conservatorship, FHFA stated that it could not, as conservator, place the Companies into liquidation.  FHFA stated at the time, and for several years into the conservatorship, that its goal was instead to "restore the [Companies'] assets and property to a sound and solvent condition," which continued course of performance constitutes evidence of the offer's original terms.  The Companies' boards shared this understanding of conservatorship when they consented.

236.     When consenting to the conservatorship, the boards of the Companies furnished good and valuable consideration to the government by agreeing to forbear from a judicial or legislative challenge that the United States feared.  *See* § 4617(a)(5).  This forbearance was unambiguously furnished in exchange for the Agencies' promises to act to restore the Companies to a safe and solvent condition.

237.     The United States and the Companies, through the acts described above, entered into an implied-in-fact contract.  The terms of that contract, as relevant here, were that FHFA if made conservator would "preserve and conserve the [Companies'] assets and property," that its conservatorship would continue only until the Companies were placed in a safe and solvent condition, and that, in exchange, the boards of the Companies would consent to, and not challenge or litigate, such a course of action.  Both the government and the Companies intended that an implied contract would exist.  That contract required FHFA to preserve the Companies' assets and property, and forbade it from diminishing or expropriating the Companies' assets and property.  This intent was demonstrated through the offer and acceptance detailed above.  The government's offer was not ambiguous in its terms, and the boards' acceptance was manifested in its subsequent imposition of conservatorship based on the boards' consent.

238.     Each Agency had actual authority, as an agency of the government, to bind the United States.

239.     The imposition of the Net Worth Sweep breached the contract by rendering it impossible for the Companies to build and retain the capital necessary to exit conservatorship and return to normal business operations.

240.    Each subsequent Net Worth Sweep payment independently breaches that contract by depleting the Companies of capital (rather than "preserv[ing] and conserv[ing]" it), in a manner that FHFA has expressly recognized undermines the goals of conservatorship.

241.    The Net Worth Sweep, thus, directly harmed Plaintiff, by preventing the termination of the conservatorship; stripping the Companies of their ability to generate and retain funds to ever distribute as dividends to holders of the Preferred and Common Stock; and nullifying Plaintiff's contractual right as a shareholder to ever receive a liquidation preference upon the dissolution, liquidation, or winding up of the Companies.  Plaintiff is accordingly entitled to damages.

## COUNT XI

### Breach of Implied-in-Fact Contract Between the United States and the Companies

### (Derivative Claim on Behalf of Fannie Mae)

242.    Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

243.    Before Fannie was placed into conservatorship on September 6, 2008, FHFA and Treasury unambiguously offered to place Fannie into conservatorship by consent, under Section 4617(a)(3)(I), with certain conditions described below, and the board of directors accepted this offer.  FHFA made no finding of insolvency, undercapitalization, or any other ground to impose conservatorship under Section 4617(a)(3)(A)-(H) or (J)-(L) without Fannie's consent.

244.    FHFA and Treasury offered, and the board of Fannie accepted, a conservatorship that would aim to "preserve and conserve [Freddie's] assets and property" and restore Freddie to a "sound and solvent condition."  *See* 12 U.S.C. § 4617(b)(2)(D).  The offer was also of a conservatorship that would end when that goal was achieved.  Neither of these conditions was ambiguous.

245.    Underlying the Agencies' offer was their promise that FHFA would not, as conservator, wind down or liquidate Fannie.  When it publicly announced the conservatorship, FHFA stated that it could not, as conservator, place Fannie into liquidation.  It also stated at the time, and for several years into the conservatorship, that its goal was instead to "restore [Fannie's] assets and property to a sound and solvent condition," which continued course of performance constitutes evidence of the offer's original terms.  Fannie's board shared this understanding of conservatorship when it consented.

246.    When consenting to the conservatorship, the board of Fannie furnished good and valuable consideration to the Agencies by agreeing to forbear from a judicial or legislative challenge that the United States feared.  *See id.* § 4617(a)(5).  This forbearance was unambiguously furnished in exchange for promises that FHFA would act to restore Fannie to a safe and solvent condition.

247.    The United States and Fannie, through the acts described above, entered into an implied-in-fact contract.  The terms of that contract, as relevant here, were that FHFA if made conservator would "preserve and conserve [Fannie's] assets and property," that its conservatorship would continue only until Fannie was placed in a safe and solvent condition, and that, in exchange, the board of Fannie would consent to, and not challenge or litigate, such a course of action.  Both the government and Fannie intended that an implied contract would exist.  That contract required FHFA to preserve Fannie's assets and property, and forbade the government from diminishing or expropriating Fannie's assets and property.  This intent was demonstrated through the offer and acceptance detailed above.  The government's offer was not ambiguous in its terms, and the board's acceptance was manifested in FHFA's subsequent imposition of conservatorship based on the board's consent.

248.     FHFA and Treasury had actual authority, as agencies of the government, to bind the United States.

249.     The imposition of the Net Worth Sweep breached the contract by rendering it impossible for Fannie to build and retain the capital necessary to exit conservatorship and return to normal business operations.

250.     The Net Worth Sweep, thus, directly harmed Fannie by preventing the termination of the conservatorship; stripping Fannie of its ability to generate and retain capital. Fannie is accordingly entitled to damages.

251.     FHFA has a manifest conflict of interest with respect to the Net Worth Sweep. FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the government, and it has steadfastly defended it in court.

## COUNT XII

### Breach of Implied-in-Fact Contract Between the United States and the Companies

### (Derivative Claim on Behalf of Freddie Mac)

252.     Plaintiff incorporates by reference and realleges each allegation set forth above, as though fully set forth herein.

253.     Before Freddie was placed into conservatorship on September 6, 2008, FHFA and Treasury unambiguously offered to place Freddie into conservatorship by consent, under Section 4617(a)(3)(I), with certain conditions described below, and the board of directors accepted this offer.  FHFA made no finding of insolvency, undercapitalization, or any other ground to impose conservatorship under Section 4617(a)(3)(A)-(H) or (J)-(L) without Freddie's consent.

254.     FHFA and Treasury offered, and the board of Freddie accepted, a conservatorship that would aim to "preserve and conserve [Freddie's] assets and property" and restore Freddie to a "sound and solvent condition."  *See* 12 U.S.C. § 4617(b)(2)(D).  The offer was also of a

conservatorship that would end when that goal was achieved. Neither of these conditions was ambiguous.

255.    Underlying the Agencies' offer was their promise that FHFA would not, as conservator, wind down or liquidate Freddie. When it publicly announced the conservatorship, FHFA stated that it could not, as conservator, place Freddie into liquidation. It also stated at the time, and for several years into the conservatorship, that its goal was instead to "restore [Freddie's] assets and property to a sound and solvent condition," which continued course of performance constitutes evidence of the offer's original terms. Freddie's board shared this understanding of conservatorship when it consented.

256.    When consenting to the conservatorship, the board of Freddie furnished good and valuable consideration to the Agencies by agreeing to forbear from a judicial or legislative challenge that the United States feared. *See id.* § 4617(a)(5). This forbearance was unambiguously furnished in exchange for promises that FHFA would act to restore Freddie to a safe and solvent condition.

257.    The United States and Freddie, through the acts described above, entered into an implied-in-fact contract. The terms of that contract, as relevant here, were that FHFA if made conservator would "preserve and conserve [Freddie's] assets and property," that its conservatorship would continue only until Freddie was placed in a safe and solvent condition, and that, in exchange, the board of Freddie would consent to, and not challenge or litigate, such a course of action. Both the government and Freddie intended that an implied contract would exist. That contract required FHFA to preserve Freddie's assets and property, and forbade the government from diminishing or expropriating Freddie's assets and property. This intent was demonstrated through the offer and acceptance detailed above. The government's offer was not

ambiguous in its terms, and the board's acceptance was manifested in FHFA's subsequent imposition of conservatorship based on the board's consent.

258.    FHFA and Treasury had actual authority, as agencies of the government, to bind the United States.

259.    The imposition of the Net Worth Sweep breached the contract by rendering it impossible for Freddie to build and retain the capital necessary to exit conservatorship and return to normal business operations.

260.    The Net Worth Sweep directly harmed Freddie by preventing the termination of the conservatorship; stripping Freddie of its ability to generate and retain capital.  Freddie is accordingly entitled to damages.

261.    FHFA has a manifest conflict of interest with respect to the Net Worth Sweep. FHFA was a signatory to the Net Worth Sweep, it benefits from it as an agency of the government, and it has steadfastly defended it in court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment as follows:

A.    Awarding Plaintiff just compensation under the Fifth Amendment for the government's taking of its property;

B.    Awarding Fannie and Freddie just compensation under the Fifth Amendment for the government's taking of their property;

C.    Awarding Plaintiff damages for the government's illegal exaction of its stock;

D.    Awarding Fannie and Freddie damages for the government's illegal exaction of their net worth;

E.    Awarding Plaintiff damages for the government's breach of fiduciary duty;

F.    Awarding Fannie and Freddie damages for the government's breach of fiduciary duty;

G.      Awarding Plaintiff damages for the government's breach of implied-in-fact contract;

H.      Awarding Fannie and Freddie damages for the government's breach of implied-in-fact contract;

I.      Awarding Plaintiff pre-judgment and post-judgment interest;

J.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

K.      Granting such other and further relief as the Court deems just and proper.

Date: August 15, 2018

Respectfully submitted,

By: _John W.F. Chesley_____

*Of Counsel*:
Matthew D. McGill
Christopher B. Leach
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

John W.F. Chesley
     *Counsel of Record*

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 955-8500
Fax:  (202) 530-9651
jchesley@gibsondunn.com

## <u>VERIFICATION</u>

I, Richard Perry, hereby verify and declare under penalty of perjury that I have reviewed

the Verified Complaint, know the contents thereof, and authorize its filing.  The foregoing is true

and correct to the best of my knowledge, information, and belief, based on investigation of

counsel.  I have personal knowledge of the facts stated in the Verified Complaint regarding Perry

Capital LLC's shareholdings, which are true and correct.


Executed on August 10, 2018          _____
                                     Richard Perry